ELEANOR PINKERTON STEWART, TRUSTEE *v.*
MAYOR AND CITY COUNCIL OF
BALTIMORE

[No. 260, September Term, 1967.]

570

*Decided July 17, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS, FINAN and SMITH, JJ.

*Benjamin R. Civiletti,* with whom were *Luke Marbury* and
*Venable, Baetjer & Howard* on the brief, for appellant.

*Clayton A. Dietrich, Chief Assistant City Solicitor,* and *Rob-
ert C. Harrison, Assistant City Solicitor,* with whom was
*George L. Russell, Jr., City Solicitor,* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The appellee, the Mayor and City Council of Baltimore, filed
a petition for condemnation of 6.93 acres of land owned by the
appellant, Eleanor Pinkerton Stewart, Trustee for her father
and stepmother. The necessity of taking was stipulated and the
issue of just compensation was submitted to the jury which
returned an inquisition for $50,000 on which the final judg-
ment was based and from which this appeal was taken.

The property is roughly semicircular in shape bounded im-
mediately on the north by Winterbourne Road, a public street,
and on the south, east and west by Gwynns Falls Park prop-
erty. To the north and east of Gwynns Falls Park in the vi-
cinity of the subject property, row house residential and apart-
ment house developments exist, and near the property to the
west is Chelsea Terrace, a community of two story cottages.

The subject land has a frontage of approximately 880 feet on Winterbourne Road, a public street which runs from North Hilton Street westerly across Hilton Parkway through the Gwynns Falls Park and Chelsea Terrace, and comes to an end at Nortonia Road. It has a width varying from approximately 30 feet to 50 feet except for that short portion between Hilton Parkway and Chelsea Terrace, for which there is a 20 foot right of way. It is along this narrow portion of Winterbourne Road that the subject property abuts. The entire property has the zoning classification E-40 which permits population density of sixteen families per acre, or a total of about 112 families for the entire property, and building structures to a height of 40 feet.

The property is divided into two lots, the westernmost and smaller lot is approximately 2.93 acres, and a larger lot contains approximately 4 acres.

At the time of taking the land was improved by two dwellings, a six room house which was unoccupied and boarded at 3503 Winterbourne Road and a ten room house which was rented at 3501 Winterbourne Road.

On July 10, 1962, Mrs. Stewart's father, Mr. Edwin B. Pinkerton, executed a contract with The Drew Company for the sale of the subject property for a maximum amount of $140,-000 and a minimum amount of $110,000 subject to the condition that a building permit be obtained by the contract purchaser for the development respectively of a maximum of 140 apartment units or a minimum of 110 apartment units on the land. Mr. Edward A. Myerberg, a builder and land developer of forty years experience, is the principal stockholder of The Drew Company and negotiated the contract of sale with Mr. Pinkerton.

Shortly after the contract of sale was executed, Mr. Myerberg, for The Drew Company, submitted a preliminary plan of development and a revised preliminary plan of development of the property (both submitted in the development name of Winterbourne Apartments Company) to the Planning Commission of Baltimore City. After the first plan was submitted, on August 22, 1962, Mr. Myerberg communicated with the Planning Commission which informed him that the plan could be ap-

proved provided additional right of way was acquired to widen Winterbourne Road, but its final decision would depend upon the intent and desire of the Park Board to acquire the property.

The revised preliminary development plan received by the Commission on September 6, 1962, showed the property subdivided into three new lots and called for the construction of a 110 unit apartment complex situated on a 30 foot wide drive leading south from Winterbourne Road into the property. This plan provided for a 15 foot widening strip along the entire frontage of the property on Winterbourne Road, to be dedicated by the property owner to public use. The plan was referred to and approved by all necessary city departments. The Department of Highways made this comment:

> "Additional R/W [right of way] should be acquired to provide for paving on Winterbourne Road 34 feet wide and footways on either side. * * *."

Mr. Myerberg testified that after he learned that the approval of a preliminary development plan was dependent upon the intent of the Park Board to take the property, he was told by Dr. Marino, head of the Park Board, that it wanted the property. On September 18, 1962 the Planning Commission rejected the revised preliminary plan.

The trial of the case began on Monday June 12, 1967. The condemnor, (the City) called only two witnesses, private appraisers employed by the City for the purpose of establishing the fair market value of the condemned property. They testified that they originally thought the highest and best use of the property to be for garden type apartments, but that they had been informed by a member of the legal staff of the City that because of the narrow road the property could not be developed for apartment purposes and was suitable for development only as park land. They further testified that their values were arrived at on the comparable sales method but their testimony oriented their comparison to one other sale, an 8 acre tract on Franklintown Road. The City's appraisers came up with the fair market value of $45,000.

On behalf of the appellant, Edwin B. Pinkerton, the 80 year old father of the appellant and one of the beneficiaries under

her trusteeship, testified the value of the property was $140,000 based on the contract of sale with The Drew Company and the demand for the site for apartment development. The appellant also called as a witness Philip E. Klein, a real estate expert. Mr. Klein expressed his opinion that the highest and best use of the subject property was for the development of garden apartments but he was not allowed to state his opinion as to the fair market value of the property for such a use. The court also ruled him unqualified to state an alternative opinion that, assuming the action of the Planning Commission of 1962 was held by the court to restrict the use of the property in 1967, the present value of the land was $88,000 because, disregarding the condemnation, there arose a more than reasonable probability that the land could be developed consistent with its zoning in the reasonably near future. Previous to the sustaining of the objections to Mr. Klein's testimony regarding the use of the property for garden apartments and its value predicated on such use, he had been permitted to testify as to comparable sales of properties zoned for apartment development. Mr. Klein finally was permitted to make the general statement that in his opinion the fair market value of the land was $88,000, but he was not permitted in his testimony to relate this value to the reasonable probability of the property's highest and best use for garden apartments.

The property owner also called Bernard M. Willemain, a qualified land planner, to testify as to the highest and best use of the land and also Mr. William P. Davis, a traffic expert, to testify that anticipated traffic generated by a 110 unit apartment project on the subject property would not place an unreasonable traffic burden on Winterbourne Road, Hilton Parkway or on Hilton Street. Although proffer was made as to what they intended to cover in their testimony, neither of these two witnesses was allowed to testify on the basis that the property owner had not furnished their names to the City in answer to interrogatories as to whom the property owner expected to call as witnesses.

The minutes of the Baltimore City Planning Commission of the meeting held September 18, 1962 were admitted in evidence as the property owner's (defendant's) Exhibit No. 19.

These minutes reveal that at this meeting at which the preliminary subdivision plan for the subject property was rejected by the Commission, it also placed the subject property in the Master Plan for Parks. The following is a pertinent extract from the minutes:

"The Deputy Director explained that the plan was rejected by the Bureau of Highways because of inadequate access to the property. The developer had offered a 15-foot widening strip along the north property line, but as Winterbourne Road is only a 20-foot road at present, it would still not provide adequate access. The Deputy Director also noted that a memorandum from the Park Board recommended that the property be placed in the Master Plan for Parks. Thereupon, the staff recommended that the preliminary plan be disapproved."

* * *

"Mr. Moser suggested that the property on the south side of Winterbourne Road east of Chelsea Road, being adjacent to Gwynn Falls Road, be placed in the Master Plan for Parks. The Park Board had not acted on this, but its staff had recommended that this be done."

* * *

"The motion was unanimously adopted, seven members being present."

On October 11, 1962 the Park Board took official action to incorporate the subject property into the Master Plan for Parks.

The appellant assigned nine errors on the part of the lower court. These covered rulings on the qualification of witnesses, matters of discovery, admissibility of evidence, exclusion of witnesses and instructions to the jury. However, we reverse and remand the case for a new trial on the basis of the lower court's errors in (1) its instructions concerning the highest and best use of the land and (2) its sustaining the city's objections to the testimony of the property owner's witness Philip E. Klein, as to the fair market value of the property based on the rea-

sonable probability of the Planning Commission, in the near future, approving some type of garden apartment development on the property.

I

The pertinent portion of the court's instructions which contains prejudicial error regarding the highest and best use of the land is as follows:

> "There is no legal evidence in the case that the Planning Commission would approve, as of today, the construction of garden type apartments on this property, even though the property is zoned E-40, and under an E-40 zoning classifications, there would be allowed generally the construction of apartments, sixteen apartments to the acre, *but the only evidence in the case of the highest and best use of the property, as of today, is for the construction on the property of three dwellings.*" (Emphasis supplied.)

In our opinion the above instruction was too restrictive and was not cured elsewhere in the court's instructions. By this instruction the court took the position that the Planning Commission's rejection of the subdivision plan for the subject property in 1962 effectively prohibited any apartment development of the property at the date of the taking, June 12, 1967, or in the near future, under its existing zoning classification, and limited the use of the property to the then existing two residences, with the possibility of a third residence. The lower court based this instruction on the premise that the property owner submitted no evidence of any other proposed use of the property within the E-40 zoning classification. Looking at the whole record we believe there was evidence that it was reasonable to anticipate that the Planning Commission would in the near future probably approve the property for some type of garden apartment development.

In considering this probability and the evidence in the record concerning it, we must not lose sight of the fact that the property still retained its E-40 classification, so it possessed one of the two basic requirements for garden apartment development, which are proper zoning and approval by the Planning Com-

mission. Proper zoning, which is frequently an obstacle in such matters, was not a problem in the instant case.

Mr. Edward A. Myerberg, a witness on behalf of the property owner who had personally been involved in real estate developments over the years, testified as to the suitability of the property for garden type apartment development. He stated in his testimony that he considered the contract between the Drew Company (of which he was the principal stockholder) and the property owner to be viable as of the date of the taking and that the $1,000 paid as earnest money at the execution of the contract was still on deposit. Certainly this was evidence that the purchaser anticipated that the Planning Commission would eventually approve some type of garden apartment development. Mr. Myerberg further testified, in reply to a question put to him on cross-examination regarding the rejection of the subdivision plan by the Planning Commission:

> "Q. I am talking about the contingencies which you have spelled out in your contract, which you are faced with, the contingencies of being able to get a permit from the Planning Commission?
>
> "A. The Planning Commission, it is my understanding, is willing to issue a — pass plans that we submitted providing however that the road be widened to forty foot, thirty foot bed, and we were willing to give the City of Baltimore the additional land to widen that part of our property which consists of about 750 foot frontage on Winterbourne Avenue.
>
> "Q. Winterbourne?
>
> "A. Winterbourne Avenue — Road rather. They were willing and ready to do it. I called personally Dr. Marco. [Dr. Marino, chairman of the Park Board.]
>
> "Q. Who did you call?
>
> "A. Doctor—he was head of the Park Board at that time."

To be sure, Mr. Myerberg's testimony, which was uncontradicted, did not establish any formal or informal action taken on the part of the Planning Commission. However, it at least demonstrates that the tentative purchaser, an experienced de-

veloper, considered the eventual approval of the Planning Commission for garden apartment development of the property a reasonable probability and a negotiable matter.

Furthermore, the minutes of the Planning Commission's meeting at which it rejected the preliminary subdivision plan in 1962 state as the reason for the rejection only the general, and unexplained, conclusion: "inadequate access." Conceivably, the plan may have been rejected for reasons totally irrelevant to the property involved. It may have been rejected because of design policy, because of poor layout or because of some condition existing in 1962, which was totally inapplicable to the property in 1967. Of course, if the Planning Commission rejected the preliminary plan solely in order to enable the Park Board to acquire the property at a value based on residential property, such action would have been completely contrary to the established law of this State. *See, Congressional School v. State Roads Commission,* 218 Md. 236, 241, 146 A. 2d 558 (1958), and cases and authorities cited therein. Although the evidence in this case would not support the inference of such crass motivation on the part of the Planning Commission, the alacrity with which it recommended that the subject property be placed under the Master Plan for Parks, this taking place at the same meeting at which it rejected the subdivision plan, does not add any compelling logic to the reasoning employed by the Planning Commission in its terse ruling rejecting the subdivision plan. In any event the minutes speak for themselves and are significant regarding the reasonable probability of future approval of the property for development consistent with the R-40 classification, had it not been for the taking for park purposes. In *State Roads Commission v. Warriner,* 211 Md. 480, 128 A. 2d 248 (1957), Chief Judge Brune, speaking for the Court, held that testimony concerning the reasonable probability of a change in zoning classification and its effect on the market value of condemned property was properly admissible, stating:

"* * *. The question has not previously been passed upon by this Court, but the rule is recognized both by text writers and by numerous cases in other ju-

risdictions that evidence of a reasonable probability of a change in zoning classification within a reasonable time may properly be admitted and its influence upon market value at the time of the taking may be taken into account. See *Nichols, Eminent Domain,* 3rd Ed., Vol. IV, Sec. 12,322 (p. 141); *Orgel, Valuation under Eminent Domain,* 2nd Ed., Vol. 1, Sec. 34 (p. 167); *City of Beverly Hills v. Anger,* 110 Cal. App. 626, 294 P. 476, a statement from which is quoted with approval by the Supreme Court of California in *Long Beach City High School Dist. v. Stewart,* 30 Cal. 2d 763, 185 P. 2d 585, at 590; *State v. Williams,* Sup. Ct. of Mo., 289 S. W. 2d 64; *City of Austin v. Cannizzo,* 153 Tex. 324, 267 S. W. 2d 808; *Portland & S. Ry. v. Ladd,* 47 Wash. 88, 91 P. 573; *Re Gibson and City of Toronto,* 28 Ont. L. Rep. 20, 11 D. L. R. 529; *Cunard v. Rex,* 43 Can. Sup. Ct. 88. We think that the rule above stated is correct." *Id.* at 484, 128 A. 2d at 250.

It is true that in *Warriner, supra,* the Court was confronted with the question of zoning classification, whereas the instant case involves approval by a Planning Commission. However, we can see no essential difference in the application of the doctrine of *Warriner* to zoning reclassification, and its application to approval by a Planning Commission of some altered or modified plan in keeping with approved zoning restrictions. In both instances we are concerned with the use to which the subject property may be put, and the reasonable probability of the proper authority approving a change in that use. Cases which have followed *Warriner,* allowing the admission into evidence of the reasonable probability of a change by regulatory bodies in the use of land in the near future and the effect which such probability may have on the fair market value of the land at the time of taking are: *State Roads Commission v. Orleans,* 239 Md. 368, 379, 211 A. 2d 715 (1965); *Congressional School v. State Roads Commission,* 218 Md. 236, 249, 146 A. 2d 558 (1958); *Bergeman v. State Roads Commission,* 218 Md. 137, 146 A. 2d 48 (1958); *Lustine v. State Roads Commission,* 217 Md. 274, 281, 142 A. 2d 566 (1958). See also *United*

*States v. Certain Land in Baltimore County,* 209 F. Supp. 50 (1962).

The introduction of testimony as to the reasonable probability of the Planning Commission's approval of some plan for a garden type subdivision of the subject property, when it had already rejected a preliminary plan does not amount to a collateral attack upon the action of the Planning Commission, which by analogy to the inviolability accorded zoning ordinances, is impermissible. *Cf. Congressional School v. State Roads Commission,* 218 Md. 236, 247, 146 A. 2d 558, 564 (1958). The Planning Commission did not decide in its short, one paragraph ruling, that all development for the use of the subject property under E-40 was prohibited, or that any plan for apartments or other use of the property consistent with the zoning and subdivision regulations in effect then, or at some future time, was prohibited; to read such finality into the determination of the Commission is an unwarranted extension of its action. The Planning Commission's decision went no further than disapproving at that time the use of the subject property for garden type apartments calling for 110 unit development.

## II

The property owner proffered that Mr. Klein would testify that on the basis of the highest and best use of the property being garden type apartment development under E-40, the market value of the property was $110,000. The proffer was further made that he was prepared to give alternative testimony, in the event the court sustained objections to his testimony predicated on the highest and best use of the land for garden apartments, to the effect that based upon the reasonable probability that in the near future the Planning Commission would give approval for garden type apartments (had it not been for the taking) the market value of the property was $88,-000. The court sustained objections to this proffered testimony but did allow Mr. Klein to testify as to comparable sales of property and also permitted him to testify as to the market value, *in vacuo,* without relating it to the highest use of the property, which value he stated to be $88,000.

In its effort to elicit the desired testimony from Mr. Klein,

the property owner sought to qualify him as an expert capable of giving an opinion as to the reasonable probability of the future development of the property for apartment purposes based on his examination of the actions of the Planning Commission over a period of time. It was established that he had testified on numerous occasions before zoning boards regarding zoning reclassifications, that he had frequently testified as an expert real estate appraiser in state and federal courts for the property owner and on occasions for the city, county and federal government, including condemnation proceedings involving the Hopkins Redevelopment area, the State Office Building complex and urban renewal. It was established that he had been in the real estate business for 30 years, was a member of the American Institute of Real Estate Appraisers for 16 years and an instructor in industrial and investment real estate at the Johns Hopkins University evening school. He testified that within the past two years he had appraised in excess of ten million dollars of apartment complex real estate and that he had actively engaged in shopping center developments.

The appellant proffered that Mr. Klein by his testimony would establish that he had made a study of the actions of the Planning Commission from 1961 through part of 1965 concerning approval of subdivisions for E-40 zoned property, involving at least six different locations, and that he was prepared to point out the similarities between such properties and the subject property. However, the lower court, on the basis that only a witness qualified as an expert land planner should be allowed to testify as to the probability of the Commission's approving the property for garden apartment development, sustained the City's objections to Mr. Klein's testimony, as it did not think he qualified as an expert in land planning.

In the case of *Marder v. Mayor and City of Baltimore,* 232 Md. 299, 303, 192 A. 2d 512 (1963) the City had filed a petition for condemnation to acquire property located in the downtown area for part of the campus of the University of Maryland Law School. The property owner sought to introduce the opinion of a Mr. Greenwald, as to the fair market value of the property. The lower court held that although Greenwald had engaged in the real estate business for three years and had ex-

perience in buying, selling, managing and the appraising of commercial and industrial property, he did not qualify as an expert witness because he had never before testified as an expert witness, had taken no academic courses in appraising and had limited experience with downtown property sales. This Court on appeal, while recognizing the frequently affirmed principle that the competency of an expert witness is usually left to the discretion of the trial court, citing *Turner v. State Roads Commission,* 213 Md. 428, 432, 132 A. 2d 455 (1957); *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 298, 29 A. 2d 653 (1943); *Preske v. Carroll,* 178 Md. 543, 16 A. 2d 291 (1940), reversed the lower court stating through Judge Marbury:

> "* * *. We think on the whole the record before us discloses that the trial judge should have exercised his discretion in determining the witness's qualifications so as to allow him to express an opinion as an expert in order that the jury might consider it. Such opinion could have been of some help to the jury in determining its award of compensation, giving the opinion such weight as in the judgment of the jury it felt it merited." *Id.* at 304.

In *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 303, 29 A. 2d 653 (1943) we said:

> "It is a familiar rule of evidence that a witness, in order to qualify as an expert, should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate. It is sufficient if the court is satisfied that the expert has in some way gained such experience in the matter as would entitle his evidence to credit. *Wilson v. State,* 181 Md. 1, 26 A. 2d 770, 773. * * * A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value, whether such knowledge has been gained from observation or experience, standard books, maps of recognized authority, or any other reliable sources."

In the instant case we think the lower court was overly exacting in the qualifications it felt that an expert should meet before being competent to testify as to the probability of approval by the Commission of a subdivision plan, the lower court posing and answering this question as follows:

"* * *. But my question: Are the qualifications of Mr. Klein, who has testified before zoning boards on zoning changes, and who teaches industrial and commercial land use at the Johns Hopkins University, such as to give an opinion as to what a Planning Commission of Baltimore City would do since the evidence in the case thus far is that it has rejected a subdevelopment plan, without any showing of any new type planning being submitted to it without the hypothesis which would be necessary as a foundation for such an opinion. The Court cannot allow in evidence by the back door what it has already ruled out in the front door, namely, the various resolutions which were marked —or various resolutions and actions taken by the Planning Commission."

\* \*. \*

"* * *. It seems to me here, if it is now being attempted to show that the action taken by the Planning Commission was unreasonable or arbitrary when it rejected the subdevelopment plan submitted by Mr. Myerberg's interest, then the proper remedy then would have been for a judicial review of the action taken by the Planning Commission, * * *"

It is obvious that the lower court appeared as much, if not more concerned, with the character of the evidence sought to be elicited from Mr. Klein, as an attempt to attack, as unreasonable and arbitrary, the Planning Commission's rejection of the subdivision plan submitted by the Myerberg interest in 1962, as it was with Mr. Klein's competency as an expert witness. The two questions are certainly severable matters and we think the misgivings of the court regarding both to be unfounded.

In our opinion the lower court abused its discretion in sustaining the City's objection to Mr. Klein's qualification to tes-

tify as to the market value of the property based on the reasonable probability of the Planning Commission's approving some type of garden apartment development in the foreseeable future.

We are also mindful of the fact that this Court in *Hutchison v. Baltimore Gas and Electric Co.*, 241 Md. 329, 332, 216 A. 2d 573 (1966) held that, although it was permissible for an appraiser in valuing property in a condemnation case to consider the probability of a tract being rezoned to a higher classification in the reasonably near future, "* * * it is manifestly improper to allow a real estate appraiser in such a case to value property as if it were in fact already zoned to the higher classification." In the instant case the last mentioned alternative to which Mr. Klein was prepared to testify took into consideration the hazard inherent in reasonable probability. His appraisal was not on the basis that favorable action by the Planning Commission was a *fait accompli*.

In addition to the evidence as to reasonable probability of approval by the Planning Commission which may have been adduced through Mr. Klein's testimony, we also have the reasonable probability of approval supported by Mr. Myerberg's testimony and the minutes of the Planning Commission; all of which would have been matters for proper consideration by the jury. See, *H & R Corporation v. District of Columbia*, 351 F. 2d 740 (D.C. 1965).

We do not deem it necessary to discuss the appellant's other exceptions to rulings by the lower court, which dealt with the objections of surprise raised by the appellee to testimony of the appellant's witnesses whose names had not been listed in the interrogatories, and objections centered on the failure of two witnesses to observe the court's ruling on exclusion of witnesses, all matters unlikely to recur upon a new trial.

For the above stated reasons, we reverse the judgment of condemnation below and remand the case for a new trial.

*Judgment reversed and case remanded,*
*with costs.*