THE HOME INSURANCE COMPANY *v.*
METROPOLITAN FUELS COMPANY

[No. 92, September Term, 1968.]

*Decided February 11, 1969.*

The cause was argued before HAMMOND, C. J., and McWIL-LIAMS, FINAN, SINGLEY and SMITH, JJ.

*Edward J. Gorman, Jr.,* with whom were *Butler & Gorman, Arthur V. Butler* and *Hugh L. Reilly* on the brief, for appellant.

*Edward B. Layne, Jr.,* with whom were *McInerney, Latham & Layne* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

This case arises out of a fire which occurred at the residence of Joseph M. Turner, Poe Road, Bethesda, Maryland, on February 23, 1965. At the time of the fire Mr. Turner carried fire insurance on his home with The Home Insurance Company (appellant) under a policy which granted the right of subrogation to the insurer against third party tortfeasors whose wrongful acts might prove to have been the cause of any loss under the policy.

On February 22, 1965, Mr. Turner's oil burner went out, as a result of which his furnace failed to generate heat. He

called the Metropolitan Fuels Company (appellee) to send a serviceman to start the furnace again. Appellee had been the sole supplier of fuel, service, repair and maintenance to Mr. Turner's home oil burner for over seventeen years. One of appellee's servicemen was dispatched to the Turner home where he worked on the oil burner. About an hour after his arrival he told Mr. Turner that a part was needed to effect the repair and he left the Turner residence and returned a short time later, presumably with the needed part. Work was continued on the oil burner until it was once again operating at which time the serviceman informed Mr. Turner that the job was completed and that the oil burner and furnace were once more producing heat.

The following evening, February 23, 1965, while preparing to go out for the evening the Turners noticed a strong smell of oil in the house. Being satisfied that the smell was the result of their oil tank having been recently filled, they departed. They returned home the same evening at about 11:30 P.M. and found their house in flames and fire department equipment on the scene. The Turners' home sustained damages in the amount of $22,786.70, which was paid them by the appellant under the fire insurance policy.

Subsequently the appellant filed suit against the appellee in the Circuit Court for Montgomery County, alleging that the negligent acts and omissions of the appellee in servicing the oil burner caused a flow of oil seeping from the oil burner to become ignited resulting in the spread of the fire from within the firebox to the exterior area of the premises with the attendant damages.

At the trial appellant called as one of its witnesses Mr. Robert Wiseman, an independent insurance adjuster, who for 35 years had specialized in investigating and adjusting fire losses. He testified that he had investigated the fire in the Turner home the day after it had occurred and during the course of his investigation had taken some pictures of the scene. These pictures were introduced into evidence by the appellant and Mr. Wiseman used them to indicate to the jury that the lowest point of the house damaged by the fire was the area below a section of the oil burner which extended beyond the furnace

casing and that the fire had burned in an upward direction from that point. Mr. Wiseman further testified that the fire started at the furnace enclosure, where he noted a heavy smell of oil, and that in his opinion the fire started from oil running out from the firebox, accumulating outside the furnace and igniting on the floor of the furnace room.

The appellant also called as one of its witnesses, Mr. Earle Poole, a Montgomery County fire inspector who testified that in his official capacity he examined and inspected the Turner home both on the night of the fire and the day after for the purpose of determining the source and cause of the fire. His first visit to the Turner home was before midnight on the night of the fire at which time he testified he smelled the odor of oil fumes. He returned to the scene the next day to inspect the furnace and oil burner. He found that the oil burner section of the furnace had oil leaking from a plate which was located outside the combustion area of the furnace. He removed four bolts from this plate to determine why the oil was leaking and he found a gasket which did not match the area to be sealed.

Inspector Poole testified that as a result of his investigation he was able to form an opinion as to where the fire had started and what had caused it. The court sustained the appellee's objection to the appellant's question as to what that opinion was.

At the close of Inspector Poole's testimony the appellant rested its case; whereupon, the defendant moved for a directed verdict on the issue of liability which was granted. It is from the judgment on the directed verdict in favor of the defendant that this appeal is taken.

We are presented with two issues in this case: (1) resolving all of the evidence, and inferences to be reasonably drawn therefrom, in favor of the plaintiff, was there legally sufficient evidence of negligence on the part of the defendant, which may have been the proximate cause of the fire, as to justify the submission of the case to the jury for determination of that issue; and (2) was the lower court in error in excluding the testimony of Fire Inspector Poole, as to his opinion, as to the probable cause of the fire.

I

This Court has so often repeated the test to be applied when

the trial court grants a directed verdict at the conclusion of the plaintiff's case, that we repeat it again at the risk of being platitudinous. It suffices to say that a case should not be withdrawn from the jury, unless, in viewing the evidence and all inferences which may reasonably be drawn therefrom, in a light most favorable to the plaintiff, there is no legally sufficient evidence of negligence for the jury to consider. *Smith v. Aulick,* 252 Md. 268, 250 A. 2d 534 (1969). *Bennett v. Bass,* 248 Md. 260, 266, 235 A. 2d 715 (1967); *Plitt v. Greenberg,* 242 Md. 359, 219 A. 2d 237, 243 (1966); *Smith v. Bernfeld,* 226 Md. 400, 174 A. 2d 53 (1961); *Ford v. Bradford,* 213 Md. 534, 541, 132 A. 2d 488 (1957); *Yellow Cab Co. v. Henderson,* 183 Md. 546, 549, 39 A. 2d 546 (1944). However, to the effect that "legally sufficient" evidence, however slight, means more than a scintilla of evidence, see *Trusty v. Wooden,* 251 Md. 294, 247 A. 2d 382 (1968) and *Fowler v. Smith,* 240 Md. 240, 246, 213 A. 2d 549 (1965).

In the instant case several witnesses, including Wiseman, the insurance adjuster; Knott, the contractor who estimated the cost of repairs and Fire Inspector Poole, all testified that the lowest point of incineration was the area of the basement floor immediately in front of the oil burner. Wiseman and Inspector Poole both testified, that based on their many years of experience in investigating fires, that fires tended to burn upwards, hence the significance of determining the lowest point of the fire. Wiseman pointed out that the area directly in front of the furnace enclosure, where the access door to the furnace rests upon the sill, which is on the basement floor, was "burned to a considerable intensity" and that the sill appeared to be "badly burned." Wiseman further testified that, "there was the odor of oil prevalent throughout the basement * * * I recall evidence of oil accumulation within the furnace room in front of the oil burner * * *." His final opinion as to the place of origin of the fire was, "the fire started at the furnace enclosure at a point either on the floor or within an inch or two of the floor * * * it was my conclusion that the fire started from oil accumulation outside the furnace, out from the firebox and igniting on the floor of the furnace room."

Wiseman's testimony did not connect the condition that he

found with any negligence on the part of the plaintiff's serviceman who repaired the oil burner. However, his testimony, when considered, and the jury could have so considered it, in connection with the testimony of Inspector Poole, has added significance.

The important segment of Inspector Poole's testimony follows:

"Q. What did you observe as a result of turning the fuel tank on? A. I found that the oil burner section of the furnace had oil leaking from it.

\* \* \*

"Q. And if oil leaked out of there, can you identify on Plaintiff's Exhibit No. 6 what area the oil would fall onto, or flow onto? A. When I opened the valve to the oil supply tank, oil leaked from that area I have indicated on the drawing, down onto the floor.

\* \* \*

"Q. Where would the oil fall? A. This being the burner right here (indicating), right beneath that burner and inside of this metal cover, which is removed. It is over here (indicating), the oil drop immediately to the floor. On the inside of this metal panel, which would be right here (indicating), underneath this burner is where the oil dropped to.

\* \* \*

"Q. And did there come a time when you examined, or caused to be physically examined, the area that you have circled in Plaintiff's Exhibit No. 2? A. Yes, I examined it.

"Q. How did you do it, sir? Physically, what did you do? A. I obtained a screw driver there, which we do not carry that equipment. I obtained a screw driver and removed four bolts and—to see why oil should be flowing from beneath this small metal cap.

"Q. And what did you determine? What did you see when you took the bolts off? A. Well, I saw a metal post in the center, which I am not exactly sure what it was. There was fuel oil in this chamber, and

this area, and *there was a gasket which did not quite match up.* (Emphasis supplied)

\* \* \*

"Q. All right. Now, what was the gasket designed to do? A. I don't know. I guess what—

\* \* \*

"Q. What did it fit between? A. It fit between a metal square top and this portion of this oil burner.

\* \* \*

"A. \* \* \* Now, this gasket was as wide as this gasket was as wide as this plate, as it was here. But the only difference was that this section of the gasket on the top opposite sides did not go between this plate and the piece underneath inside it. It came in and the outer edge here (indicating) just barely filled the inside of it. In other words, at no point was it underneath, even though a space here and here, and this is the two sides *where the oil had leaked out.* (Emphasis supplied)

\* \* \*

"Q. Now, from a visual examination of this sort of a dog bone gasket, as you have drawn there, could you determine whether or not it was a new gasket or an old gasket or whether or not there was a gasket on it or not? A. No. I don't at this time. There's nothing in the report on this. I can't recall.

\* \* \*

"Q. All right. Now sir, if this bellows, which you have drawn on the blackboard, or whatever name it is, which had a gasket that was not shaped to fit the metal part either above or below, and if the oil was turned on in this furnace prior to the fire, would oil have leaked out from where this gasket should have been? A. I couldn't say whether it would or would not be possible.

"Q. Now, could you tell from an examination of this gasket, whether the gasket was in fact meant to fit this piece or whether or not it was the wrong gasket for this piece? A. It would definitely appear to me

that the gasket did not contain—did not fit the shape of that, and our investigation showed *that it apparently did not seal.* (Emphasis supplied)

In sum, the case being withdrawn from the jury at the conclusion of the plaintiff's case, the following testimony was undisputed.

The service repairman of the defendant worked on the furnace within forty-eight hours of the conflagration. He was observed working "on a device that is just on the outside of the furnace, a motor-type of device * * *." No one else touched the furnace from the time the repairs were made until the fire occurred. A strong odor of oil emanated from the furnace area within one day after the repairs were made. There was evidence that fuel oil accumulated on the basement floor outside the furnace jacket after the repairs had been made.

This same area was the lowest point of the fire and it appeared to have its greatest intensity in that area. There was also testimony from experienced witnesses that fire tends to burn upwards. The Fire Inspector found oil leaking outside the furnace jacket, which oil, he testified, fell to the floor in the same area as what was, in his opinion, the lowest point of the fire. The Fire Inspector testified that he turned on the fuel tank and visually observed that the oil burner section of the furnace had oil leaking from it. He manually dismantled part of the equipment and found a gasket which he described as "not quite matching up." The Inspector's testimony on this point is not all that one might have desired, but it is undisputed. He could not state whether the gasket was old or had been recently replaced, however, he did state that "it apparently did not seal."

In view of these facts, we are of the opinion that resolving all of the evidence, and inferences to be reasonably drawn therefrom in a light most favorable to the plaintiff, there was legally sufficient evidence of negligence,[1] as to the manner in which

---

1. In *Keitz v. National Paving Co.*, 214 Md. 479, 494, 134 A. 2d 296 (1957), Judge Henderson writing for the Court points out that " * * * All actionable negligence consists of two elements: one, a negligent act or omission; and two, the negligent act or omission must cause or contribute to the injury complained of. * * *."

the repairs were made and that such negligence was the proximate cause of the fire, as to warrant the submission of that issue to the jury.

## II

For the disposition of this case it is not necessary for us to reach the second question before us upon appeal, namely, the question of whether the lower court erred in not permitting Fire Inspector Poole to testify as to the probable cause of the fire; however, since this same issue may well again arise on a retrial of this case we deem it appropriate to discuss its merits.

Inspector Poole had been employed by the Public Safety Department of Montgomery County assigned to the Fire Marshal's Office from 1959 until the time of the occurrence of the fire in question on February 22, 1965, a period of approximately six years. He passed an examination to obtain the position. His duties were twofold, that of enforcing the fire protection code of the county and inspecting fires to determine their cause. It is well established law in this State that the qualification of a witness as an expert is within the sound discretion of the trial court; however, in light of the decisions of this Court in analogous situations we think there was an abuse of the lower court's discretion in refusing to permit Inspector Poole to state what was his opinion as to the probable cause of the fire.

In the recent decision of *Nizer v. Phelps,* 252 Md. 185, 249 A. 2d 122 (1969), Judge Barnes reviewed at length the question of the qualification of an expert witness and cites many Maryland decisions therein. In *Nizer,* the question arose as to the competency of a police officer who had spent fourteen years in the Accident Investigation Division of the Baltimore City Police Department, to testify as to what, in his opinion, was the point of impact between a motorbus and a pedestrian. See also *Stewart v. Mayor and City Council of Baltimore,* 250 Md. 569, 580, 244 A. 2d 231 (1968), and *State v. Gray,* 227 Md. 318, 176 A. 2d 867 (1962).

It is unquestionably true, that it takes greater expertise to determine the cause of a fire than the point of impact in a collision, or for the interpretation of markings on the highway, *Acme Poultry Corp. v. Melville,* 188 Md. 365, 53 A. 2d 1 (1947). Inspector Poole, however, had been working in the

fire investigating field for six years in a populous county and we think it was arbitrary to hold that he had not by that time gained sufficient knowledge and experience to qualify as an expert witness who could express an opinion concerning the probable cause of a fire he investigated while acting in his official capacity as a fire inspector.

*Judgment reversed, case remanded for a new trial, appellee to pay costs.*