## STICKELL, ET UX. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 74, September Term, 1968.]

*Decided per curiam January 29, 1969.*

*Opinion filed February 20, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Samuel Kimmel,* with whom were *Joseph K. Pokorny* and *Kimmel & Pokorny* on the brief, for appellants.

*Clayton A. Dietrich, Chief Assistant Solicitor* and *Robert C. Harrison, Assistant City Solicitor,* with whom was *George L. Russell, Jr., City Solicitor,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appeal in this case was taken from a judgment rendered by the Superior Court of Baltimore City (Perrott, J.) awarding damages for the taking of property owned by the appellants, Clarence M. Stickell, Sr. and his wife, Katherine W. Stickell (the Stickells) by the appellee, the Mayor and City Council of Baltimore (the City) in a condemnation proceeding. The jury having returned an inquisition finding damages in the amount of $81,000, the trial court, on October 30, 1967, entered a judgment in that amount.

After argument, the appellants requested us to indicate as early as possible our decision in the case. Accordingly, we passed a per curiam order on January 29, 1969, indicating that we affirmed the judgment of the lower court, with costs, and that our opinion would be thereafter filed. Our opinion follows:

The subject property, known as 1614-1622 Mount Royal Avenue, is located in Baltimore City and is part of the Mount

466

Royal-Fremont Project of the Baltimore Urban Renewal Program. It consists of two separate parcels of land, the first of which is a rectangular lot, beginning at a point 106 feet 10 inches northwest of the intersection of the western line of Mount Royal Avenue and the northern line of McMechen Street, running 72 feet along the western line of Mount Royal Avenue, with a depth of 100 feet extending to the east side of an alley running parallel to Mount Royal Avenue, then 72 feet along the alley and 100 feet back to the point of beginning. The second parcel is immediately adjacent to and northwest of the first and is also a rectangle, having a frontage of 16 feet, 3¼ inches on Mount Royal Avenue, and a depth of 100 feet running to the same alley. Together the two pieces of land have a frontage of 88 feet, 3¼ inches and a rectangular depth of 100 feet. The first parcel is improved by a large structure, 1614-1620 Mount Royal Avenue, which was originally built in 1894 and in 1905 as a church, and by a smaller one-story brick garage-shop building at the rear of the main building. The church is a one story and basement stone construction building, which has been converted to use as a retail store and showroom with auxiliary office and storage space. The second parcel, 1622 Mount Royal, is improved by a three-story brick row-type structure, originally designed for use as a dwelling house, but presently used as a storage area in conjunction with the retail business on the adjacent property. All of the property is zoned first commercial. For the past 21 years, since the conversion of the church to its present use, the Stickells have conducted a retail marine equipment and supplies business on the premises. In addition to the conversion of the church and the erection of the small building in the rear, the only other recent improvement is the enclosing of the front yard by a chain-link fence, topped with barbed wire, to provide additional display space, primarily for boats.

At the trial below, the city introduced two expert witnesses: Leslie S. Wilson, Jr. and Charles M. Schwartz. Both qualified as expert appraisers. Mr. Wilson testified that the highest and best use for the property was its present use. He then appraised the subject property, first using the "comparable sales" method. He analyzed several sales of other property in the area, all zoned first commercial, and all sold within a few years

preceding. Having found that on a square footage basis, they had sold for between $9.96 to $14.99 per square foot, and that the subject property was a less desirable piece of property, he concluded that the subject property was worth $12.55 a square foot or a total of $77,000.00. He then used the "income approach." He testified that the gross income generated by the property was $11,342.00 and that the net income after expenses was $7,791.00. Capitalizing this at 10%, he concluded that the value of the property was $77,900.00. He also testified to a third method of appraisal, the "replacement cost less depreciation" approach, which he stated he "didn't put too much faith in." Using this method of calculating, he found that the total value of the three buildings on the subject property was $50,903.00 which added to the land valuation of $30,800.00 yielded a total of $81,703.00.

The second witness for the condemning authorities was Mr. Schwartz. He also testified that "the highest and best use of the property is the use [to which] it is being put, a retail distribution and sales." He specifically denied that a church use was a higher and better use, which he felt was evidenced, among other factors, by the fact that the present owners had spent a considerable amount of money converting it from a church to its present use, and that accordingly, a large amount of money would be required to re-convert it back to a church use. He used the same three methods of appraisal as Mr. Wilson. Using the comparative sales approach (based on the same sales that Mr. Wilson used) he found that the value of the subject property was $81,000.00. Using the cost approach, he stated that the combined replacement cost less depreciation of the buildings was $48,576.00 which added to the land valuation of $35,300.00 yielded a total of $83,800.00. Under the income approach, he capitalized $4,546.00 income which he felt the buildings generated at 10% and added to this $35,300.00 valuation of the land which gave a total value of $80,760.00. This testimony completed the City's case.

The appellants then called to the stand George W. Rokos, whom they attempted to qualify as an expert appraiser. Mr. Rokos stated that he had done appraising while he was in the Right-Of-Way Department of the Bureau of Planning and Sur-

veys for seven years, and that for the past ten and one-half years, he had been a real estate broker and had done appraising for private clients, some of whom he identified. Next, counsel asked Mr. Rokos to define "fair market value of property." The following colloquy then transpired:

"Q. Will you give the Court your definition of fair market value of property? A. I couldn't hear you.

"Q. Would you give the Court your definition of fair market value of the property? A. My appraisal shows that we have arrived—

"Q. Not what the figures are. Your definition of fair market value. How did you arrive at fair market value? A. I take the cubic footage of the building—."

At this point the court called for a recess during which time, he conferred with counsel for both parties. He then stated, it being Friday afternoon, that the court would recess until Monday morning. He admonished Mr. Rokos not to discuss the case with anyone. Before recessing, Judge Perrott also said to counsel for the appellants, "I trust you are going to bring in Mr. Marion Cox" (who had been listed in the answers to interrogatories as an expert witness for the appellants). Counsel answered, "Yes sir, I'm going to try to bring him."

At the continuation of the trial, on the following Monday, Mr. Rokos was recalled to the stand. The following then took place:

"Q. Would you tell the Court the experience that you've had in real estate appraising? A. Well, I have given my opinion many times as to the value of property here in the City of Baltimore. Buyers ask you to find property for them as to "X" dollars per square foot and we do this.

* * *

"Q. Were you qualified in this Court or any other Court, Baltimore City, County? A. Just as an appraiser, no, sir, not as an appraiser. I have been asked many times what I thought the value of property was.

"Q. In a Court? A. Pre-court work, but in Court a few times.

"Q. Would you give the Court your opinion of fair market value? A. Well, I would have to qualify that. If I could see my notes—I haven't seen my notes or talked to anyone since we met Friday on instructions of the Court. I would have to refresh my memory as to the value that I put on it.

"Q. How did you arrive at the fair market value? A. I arrived at the fair market value by taking the Boech's Index and—which is our bible in the establishment of property values — and bringing it up to date, and taking the cubic feet of the church structure and then multiplying that, of course, coming up with the answer as to the per dollar value of the property. The Index is based on the prices of 1926-1929, that is, prices of brick, mortar, concrete, labor, electrical, wiring, so forth, in that area 1926-1929, and then we have to bring it up to date as to the exact cost based on a hundred multiplied by that factor. I think I came up with 2.68, and that enabled me to arrive at a figure that I did in that opinion that I gave you."

At this point, counsel for the City moved that Mr. Rokos be excluded as an expert appraiser. After hearing arguments by counsel, the court agreed and stated:

"I think Mr. Rokos has been completely candid with the Court. He has established himself as probably a very competent procurer of real estate for clients; he goes out and looks it over and advises the client as to the worth of it and probably negotiates it. Based on qualifications that you have sought to elicit from him, I cannot see where he does qualify as an expert appraiser.

"(Mr. Schafer) (counsel for plaintiffs) Your Honor, we are trying to establish — this is a difficult and odd type of property, and we've had the appraisers for the City—

"(The Court) Mr. Schafer, unless you can rehabilitate Mr.——again, Mr. Rokos, please understand, this is nowise criticism of you. I commend you for your

complete candor with the Court. You apparently did not know even the definition of fair market value which was propounded to you by Mr. Schafer. Now, either you are an expert appraiser or you are not, and that's what we've got to determine.

"(Mr. Rokos) Isn't a broker an appraiser?

"(The Court) No, no, he isn't, Mr. Rokos. And again, please don't feel that the Court is in anywise critical of you. I know you by reputation; you are a very fine gentleman.

"(Mr. Rokos) Thank you.

"(The Court) Sorry that I find myself in this position, because I know that you may interpret it as casting a reflection on you, which it isn't, but I must say I have to agree with Mr. Harrison. I don't believe that you qualified, Mr. Rokos, as an expert appraiser. Now, if you want to try to elicit some more questions, Mr. Schafer, I'll be happy to have you do it. I don't think anything further should go to this jury before I make a ruling, and I'm prepared to rule unless you want to go forward.

"(Mr. Schafer) Where Mr. Rokos has tried to establish value based on construction cost—

"(The Court) Mr. Schafer, I'm going to say this right in the presence of your client. You have a very good real estate appraiser, a man who is a recognized authority. I am at a complete loss to understand why, even in spite of the Court's request to you, why you have not brought him in.

"(Mr. Schafer) Your Honor, he was summonsed in to the Court on Friday. The summons was taken out Friday. I checked this morning, it went out Saturday but they don't know whether it's been returned or not.

"(The Court) You find out whether it's been served. If it's been served, I'll see to it that he is here. Really, Mr. Schafer, I couldn't admit Mr. Rokos' testimony based on what I've heard.

"(Mr. Schafer) All right, sir."

Appellants then called another witness who proved to be absent. Finally, they called the appellant, Clarence M. Stickell who was asked four brief questions, the last of which was "What do you think your property is worth?" He answered, "* * * $187,000.00."

The court then granted another recess to allow the appellants to check on Mr. Cox. As they were unable to find him, the court instructed the jury, which, after deliberation, returned an inquisition in the amount of $81,000.00.

The single question presented to us by this appeal is whether the lower court committed reversible error by refusing to permit the witness, Rokos, to testify and give his opinion of the value of the appellants' property. We find that under the circumstances of the case, the ruling of the lower court was free from error.

The competency of an expert witness to testify as to matters within his expertise is generally a preliminary question for the court. *Levine v. Moreland,* 229 Md. 231, 182 A. 2d 484 (1962) ; *Yukin v. State,* 229 Md. 223, 182 A. 2d 798 (1962) ; *Rotwein v. Bogart,* 227 Md. 434, 177 A. 2d 258 (1962) ; *Pumphrey v. State Roads Commission,* 175 Md. 498, 2 A. 2d 668 (1938) ; see also 31 Am.Jur.2d, *Evidence* § 31 at 532 (1967). It is well established that a person must demonstrate a minimal amount of competence or "expertise" on the subject on which he is allegedly an expert in order to be qualified to testify as an expert witness. Cf. *Rotwein v. Bogart,* 227 Md. 434, 177 A. 2d 258 (1962). Accordingly, the determination of whether a witness is qualified as an expert witness is generally within the discretion of the court, and will not be overturned unless his discretion has been manifestly abused to the prejudice of the complaining party. *M. A. Realty Co. v. State Roads Commission,* 247 Md. 522, 233 A. 2d 793 (1967) ; *State Roads Commission v. Creswell,* 235 Md. 222, 201 A. 2d 328 (1964) ; *Turner v. State Roads Commission,* 213 Md. 438, 132 A. 2d 455 (1957). Thus, in the *M. A. Realty* case, we stated:

"Questions in regard to the qualification of an alleged expert witness are largely in the discretion of the trial court and the court's determination of whether

the witness is qualified will only be disturbed on appeal if there has been a clear showing of abuse of the trial court's discretion." (247 Md. at 526, 233 A. 2d at 796.)

In the present case, the witness Rokos was offered as an expert appraiser. He testified in regard to his experience in the real estate business, stating that "I'm told to go out and find a piece of property with "X" number of square footage and bring it in at the right price." While he may be a very competent broker or procurer of property, there is certainly nothing in this testimony which would indicate that he is a qualified appraiser.

Code (1957) Art. 33A, § 5 (a) (1967 Repl. Vol.) provides that in an eminent domain proceeding:

"The damages to be awarded for the taking of an entire tract shall be its fair market value."

The definition of "fair market value" is set out in Art. 33A, § 6, as follows:

"The fair market value of property in a proceeding for condemnation shall be the price as of the valuation date for the highest and best use of such property which a seller, willing but not obligated to sell, would accept for the property, and which a buyer, willing but not obligated to buy, would pay therefor excluding any increment in value proximately caused by the public project for which the property condemned is needed, plus the amount, if any, by which such price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of such property and the date of actual taking if the trier of facts shall find that such diminution in value was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning such public project, and was beyond the reasonable control of the property owner."

These sections have been held to be a restatement of the preexisting case law. *State Roads Commission v. Adams,* 238 Md. 371, 29 A. 2d 247 (1965); *Duvall v. Potomac Electric Power Co.,* 234 Md. 42, 197 A. 2d 893 (1964). Thus, in order for an expert's appraisal to have any relevance, it must be in accordance with the statutory definition. While we certainly do not intend to imply that it is necessary for an expert to be able to recite the words of the statute, it is basic that he have minimal understanding of the principles implicit in this definition.[1] The first time the appellants attempted to qualify Mr. Rokos, he was asked the definition of "fair market value" three times, and his answers showed that he could not give such a definition, but instead he attempted to state his conclusion as to the value of the property. At this point, Judge Perrott recessed, and gave the appellants a second opportunity to qualify Mr. Rokos after the weekend. Again, he talked about "going out to find property for * * * [his clients] in certain per dollar value, where you know that is what the property is worth or should pay that and no more." His testimony was not entirely clear that he had ever qualified as an appraiser in any court, and again could not define fair market value, other than by reference to his own findings. He attempted to explain that his appraisal was based on "Boech's Index" which he said was a guide to construction costs, based on 1926-1929 prices, which he brought up-to-date. The use of replacement costs is certainly a proper method of appraisal but replacement costs are not admissible unless evidence of depreciation is submitted at the same time. *Mayor and City Council of Baltimore v. Schreiber,* 243 Md. 546, 554, 221 A. 2d 663, 667 (1966); *McGaw v. Mayor and City Council of Baltimore,* 131 Md. 430, 433, 102 A. 544, 545 (1917). Mr. Rokos never showed that he understood this basic principle and while we need not reach the question of the admissibility

---

1. An exception may be the owner of the property who is prima facie competent to express his opinion as to its value without qualification as an expert. *M. A. Realty Co. v. State Roads Commission,* 247 Md. 522, 233 A. 2d 793 (1967); *City of Baltimore v. Schreiber,* 243 Md. 546, 553, 221 A. 2d 663, 667 (1966); *Smith v. Potomac Electric Power Co.,* 236 Md. 51, 60, 202 A. 2d 604, 609 (1964).

of his appraisal, his lack of understanding is another factor weighing against his preliminary qualification to testify.

Thus, in *Tennessee Gas Transmission Co. v. Wood,* 331 S.W.2d 808 (Tex. Civ. App. 1960), it was considered to be reversible error to allow expert witnesses to testify as to the value of land "without a clear showing that they were testifying concerning the 'market value' of the land" (331 S.W.2d at 810). Similarly, in *Temescal Water Co. v. Marvin,* 121 Cal. App. 512, 516, 9 P. 2d 335, 336 (1932) the trial court's refusal to allow a witness to testify where the witness "did not comprehend the true meaning of market value" was upheld. See also *White v. Pennsylvania R. R. Co.,* 229 Pa. 480, 78 A. 1035 (1911).

The appellants, in urging us to reverse the ruling of the trial court rely on the case of *Marder v. Mayor and City Council of Baltimore,* 232 Md. 299, 192 A. 2d 512 (1963). We believe that the facts of the *Marder* case are distinguishable from the case at bar, and that it lends no support for the appellants' position. The appellants' witness in the *Marder* case not only had extensive experience in *appraising* real estate, but showed that he fully understood *all three* of the usual methods of appraising property.

The general rule as to when expert testimony is admissible is that it will be allowed where such testimony can be of appreciable help to the jury in resolving an issue. See *e.g., Nizer v. Phelps,* 252 Md. 185, 249 A. 2d 112; *Home Ins. Co. v. Metropolitan Fuels Co.,* 252 Md. 407, 250 A. 2d 535. *Cf. Stewart v. Moyor and City Council of Baltimore,* 250 Md. 569, 244 A. 2d 231 (1968). Thus, an expert's opinion must be predicated on facts legally sufficient to form a basis for his opinion. See, *e.g., Hance v. State Roads Comm.,* 221 Md. 164, 168-69, 156 A. 2d 644, 646 (1959). See generally *State v. Critzer,* 230 Md. 286, 289-90, 186 A. 2d 586, 588 (1962).

In the present case, Mr. Rokos may have had a very extensive knowledge of real estate and his "intuitive" approach to appraising may have yielded reasonably accurate results. In our opinion, however, he was unable to explain his results in terms of normal methods of appraisal, so that the trial court was justified in finding that his testimony could have been of no as-

sistance to the jury. As the trial court observed, its ruling should not be interpreted as disparaging Mr. Rokos. As we have indicated, he is probably an extremely competent real estate broker, but we do not believe that, as such, he is automatically qualified to testify as an expert appraiser.

In summary, it is well established that the trial court has great latitude in ruling on the admissibility of expert testimony, and that we will reverse such a decision only when there is a clear showing of abuse of the trial court's discretion. In the present case, the trial court afforded the property owners every opportunity to establish their witness' qualifications, and only after it became clear that any further efforts would be unavailing, did it exclude the testimony of the witness. We cannot find on these facts that there was an abuse of the trial court's discretion.