5 A.3d 1144

**Samuel J. BROWN**

v.

**Bernice D. BROWN.**

**No. 1015, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 30, 2010.

74

Joel R. Zuckerman & James S. Maxwell (Maxwell & Barke LLC, on the brief) Rockville, MD, for appellant.

Linda Haspel (Haspel & McLeod, PC, on the brief) Rockville, MD, for appellee.

Panel: HOLLANDER, EYLER, JAMES R., and LAWRENCE F. RODOWSKY, (Retired, specially assigned) JJ.

HOLLANDER, J.

This appeal arises from divorce proceedings in the Circuit Court for Montgomery County involving Samuel Brown, appellant, and Bernice Brown, M.D., appellee. Following a trial in May 2008, the court issued a Memorandum and Order

dated May 23, 2008, granting appellee the following: an absolute divorce under §§ 7–103(a)(7) and (8) of the Family Law Article ("F.L.") of the Md.Code (2006 Repl.Vol.);[1] a monetary award in the amount of $215,000; attorneys' fees in the amount of $12,500; and the transfer to appellee of title to the parties' residence.[2]

On appeal, appellant presents four issues, which we quote but have reordered:

1. Whether, under Family Law Article § 8–205(a)(2)(iii), the Divorce Court lacked authority to transfer a jointly-owned former marital home the parties agreed was to be treated as non-marital, given that the statute provides that the transfer must be ordered "as an adjustment of the equities and rights of the parties concerning marital property."

2. Whether the value set by the Divorce Court for the entity called Stone Development, LLC, jointly-owned by the parties, solely based upon an interrogatory answer by husband reciting that a Wall Street Journal Online website estimated the value of an LLC Property at $259,621, should be set aside as clearly erroneous and not reasonably representative of the value of the parties' interest in the LLC.

3. Whether the Divorce Court abused its discretion and/or erred as a matter of law by granting a monetary award to wife in excess of the value of the marital property the Divorce Court itself determined was titled in the name of husband, resulting in wife's receiving more than what the court determined was the value of all of the parties' marital property.

4. Whether the Divorce Court abused its discretion by awarding attorneys' fees to be paid by a jobless, virtually penniless husband, to a cardiologist wife the Divorce Court

---

**1.** These provisions pertain, respectively, to cruelty and excessively vicious conduct.

**2.** Judgments were also issued as to the monetary award and the award of counsel fees.

found possessed non-marital property in excess of $1,000,000.

For the reasons that follow, we shall affirm in part, vacate in part, and remand for further proceedings.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

The parties were married on June 1, 1999. Appellee is a cardiologist and appellant is an attorney licensed to practice law in Texas. No children were born to the union. The parties separated on or about May 19, 2007. On June 6, 2007, appellee filed a Complaint for Absolute Divorce. As of the trial in May 2008, appellant was fifty-four years old and appellee was fifty years of age.

The court issued a Scheduling Order on August 28, 2007, establishing a discovery completion date of December 21, 2007. On October 26, 2007, appellee noticed appellant's deposition for December 12, 2007. Appellant moved for a protective order as to his deposition, which appellee opposed. On December 6, 2007, the court (Harrington, J.) issued an Order denying appellant's motion, ordering him to attend his deposition and to provide appellee with all requested discovery within three days. Nevertheless, appellant failed to appear for his deposition or produce the requested discovery. Consequently, appellee filed a Motion for Sanctions and Request for Default Judgment on January 17, 2008, which appellant opposed. On February 29, 2008, the court entered an Order that "prohibited [appellant] from introducing into evidence or referring to any document which was requested by Plaintiff," and from "making a claim for attorneys' fees, alimony, or a monetary award." It also awarded reasonable attorney's fees to appellee, in "a sum to be determined at the merits hearing after Defendant has the opportunity to be heard."

---

**3.** This Court filed an unreported opinion in this appeal on August 13, 2010. Pursuant to Rule 8–605.1, appellant has requested publication of the opinion.

Pursuant to Maryland Rule 9–207, on May 1, 2008, the parties filed a Joint Proposed Statement Concerning Marital and Non–Marital Property ("Joint Statement" or "9–207 Statement"). The parties' residence, located at 15009 Notley Road in Silver Spring, was owned as tenants by the entirety ("TBE") but was listed on the 9–207 Statement as "non-marital." The parties agreed, however, that title was "Joint." We shall discuss the 9–207 Statement in more detail, *infra*.

Trial commenced on May 7, 2008 (Rubin, J.). Appellant did not appear because, according to his lawyer, he was incarcerated on "an outstanding warrant stemming from [an earlier] domestic violence incident." Appellant's lawyer indicated that he was "waiving" appellant's "appearance" and "ready to move forward."

Appellee testified that she is a physician and was the sole financial contributor to the marriage. Describing appellant as "extremely abusive," Dr. Brown stated that, "throughout the marriage, Samuel J. Brown abused me physically, mentally, verbally and emotionally," and asserted that "[t]he incidents are too numerous to mention." According to appellee, appellant repeatedly "humiliated" her in "public places" and "criticized and denigrated [her] in the presence of others." She also stated that "every single day" the parties had "an argument about something. He would get ticked off about something . . . . he would get mad at me at the drop of a hat. . . . It was like a daily thing." Therefore, when the parties separated, she "felt like a weight had been lifted . . . off [her] shoulders."

Appellee described in detail numerous incidents of physical and verbal abuse during the marriage, which "destroyed her spirit." She said: "I was just existing. . . . He destroyed my happiness, and there was no joy in my life." For example, appellee recounted [4]:

---

**4.** Because appellant does not contest the grounds of divorce, we have omitted testimony as to some of the incidents of abuse.

We were at the hotel [in August 1999] and we had an argument, and during the argument, he backhand slapped me across my face and he split my lower lip, and I tried to get to the phone and, again, he prevented me from making a call. And he prevented me from leaving the hotel room.

Appellee also recalled an episode of domestic violence that occurred in November 1999:

I was sitting on the sofa and I was watching television and he asked me to come to bed and I told him that once that show was over that I would come up. It was only about 15 minutes and he said, come to bed now. And I said I'd be up, you know, after this is over. I just wanted to see the end of it.

And then he grabbed my arm, and I fell to the floor and he dragged me from the family room, across the kitchen floor, into the hallway at the foyer and he threw my body up against the wall and he demanded that I get up. And I was afraid to get up because I thought he would just push me again. So I stayed there and then he went and got a pitcher of water and he dumped it on me.

With respect to an incident in 2000, appellee testified:

I was sitting down on the sofa with my laptop doing some work and he came into the room and he was talking to me and I continued to look at the laptop. And he yelled at the top of his voice, why I would not look at him when he was talking, and he came over and he slammed the computer top down, and it almost caught my fingers. But I jumped back in time.

And I had some papers beside me and he took those papers and he just flung them across the room. And then I got up to get the papers and he pushed me and I fell backwards. And I had my glasses on. He grabbed the glasses off of my face and he flung them.... And he prevented me from making a phone call.

Dr. Brown also described an incident that occurred on June 24, 2004, when appellant became "enraged" about a bill. Appellee claimed that appellant repeatedly pushed her, she

fell, and he prevented her from calling 9-1-1. As a result of that incident, appellee obtained a temporary protective order on June 25, 2004.[5]

In addition, appellee testified to an incident on May 19, 2007, stating:

He attacked me in the exercise room. We had had, he had started this bizarre argument about the smoke detector battery. He had changed it and the battery that he removed from it was different from the one that he had placed in it before, so he asked me had another man come into the house and replaced it. . . . And then he got into my face and he was saying, shut your big fat mouth. . . . And then he just lost control. He shoved me so hard that I went backwards into the Bowflex machine and then he yelled at me to get up and then when I got up, he started strangling me. And I screamed and he had come to sit down. I sat on a bench and he pushed me off the bench and when I was on the floor, I felt pain in my back and so I went and looked in the mirror and I saw a lot of bruises on my back and I saw that my finger was cut.

Appellee was examined at Holy Cross Hospital on the same date.[6] She obtained a final protective order against appellant

---

5. A copy of the protective order was admitted into evidence. Montgomery County Police Officer Sherry Law testified that on June 24, 2004, appellee "reported an incident of domestic violence." In Law's report, admitted into evidence, the officer wrote that appellee told her that, following a dispute between the parties regarding their cable service, appellant "hit her wrist, knocking the phone off her hand, then grabbed her by her arm and threw her across the room." Appellant "proceeded to push [her] throughout the house, finally pushing her onto the living room steps." Officer Law also wrote: "At the station, B. Brown showed the writer the following: red marks/abrasion on right inner wrist; bruise on right bicep. B. Brown also advised that this was not the first incident of violence. . . ."

6. Montgomery County Police Officer Matthew Doyle testified that he responded to Holy Cross Hospital in May 2007, following an alleged incident of domestic abuse involving appellee that occurred earlier that day. He noted "[i]njuries to her, her hand and her back. It was actually her index finger." According to Doyle, appellee was "obviously upset. She was trying to stay calm but you could tell she was upset,

on June 21, 2007.[7]

According to appellee, appellant "contributed nothing" to the marriage, monetary or non-monetary. She asserted: "The sole contributor was myself." Appellee explained that, since the marriage in 1999, she paid all of the mortgage payments for the parties' home from her salary, in the amount of $2,089.89 per month, as well as all of the real estate taxes. Appellee also paid all of the mortgage payments after the parties separated. In addition, appellee claimed that she "did all of the laundry.... Some cooking. General upkeep of the house," while appellant only cooked "sporadically."[8]

Because appellant is not licensed to practice law in Maryland, appellee "suggested [to appellant] that he could do the medical billing for [her] medical practice." She stated: "He did the medical billing for [her] cardiology practice sporadically from 2000 to 2004," as well as "the first couple of months of 2005." She continued:

> That stopped because I found out that he wasn't doing it properly. He was not following-up on denials from the insurance companies. And he was not billing the patients for their portions of the bills and the income, the thing that made me look at that was that the income for my practice, I do private practice and all of a sudden the income was very low. And I looked into it and found out that he was not doing it appropriately.

---

very, very nervous." He added: "From all the statements, from what she was saying, she was just tired of everything going on. The way she was acting and she just seemed very nervous, fearful, along those lines." Photographs of appellee's injuries were introduced through Montgomery County Deputy Sheriff Robert Bolstner.

7. A copy of the protective order was admitted into evidence.

8. Appellee acknowledged that appellant arranged for handyman services to the extent they were needed, but she maintained that she paid for the services. She also conceded that appellant bought her gifts for the holidays and her birthday, and that the parties went to the movies, to dinner, and took trips.

And I brought that to his attention and he told me I should do the billing, and so then I hired a professional billing company which took over in 2005.

According to appellant, there "was a dramatic increase in [her] salary after the professional billing company took over."

Appellee testified that she and appellant are joint owners of Stone Development, LLC ("Stone Development"), a "company that [appellant] started." The parties agreed in their 9–207 Statement that Stone Development was a marital asset. Appellee testified that the purpose of the business "was to purchase foreclosure properties and then to sell them at a profit." According to appellee, appellant "had some plans to build on the land and sell." She claimed that appellant used $50,000 from their Vanguard account, to which she solely contributed, and purchased "[f]ive parcels of land in Michigan." In addition, she claimed that appellant purchased a house and a vacant lot in Indianapolis, after she "loaned" appellant $25,610.00 for the down payment. Further, appellee claimed that appellant obtained a home equity loan against the Notley Road house for $25,000.

Appellee introduced into evidence Mr. Brown's Supplemental Answers To Plaintiff's Interrogatories, produced by appellant on October 25, 2007. In response to appellee's Interrogatory 9, which sought information regarding property owned by either or both parties, appellant said that he owns "a home at 15009 Notley Road, Silver Spring jointly with [appellee]. The fair market value estimated from the Wall Street Journal website . . . is $782,348.00." Further, appellant stated that he and appellee "own . . . Stone Development, LLC, 2112 North Park Ave. Indianapolis, Indiana, which owns a house and contiguous lot. The fair market value estimated from [the] Wall Street Journal web site [is] $259,621." Appellant continued: "However, this property is subject to a lawsuit, entitled Samuel J. Brown, Stone Development, LLC v. Samuel Standard, et al. Marion Superior Court No. 49D11–0609–PL–37775." Appellant also stated: "The purpose of the [lawsuit] is to obtain complete ownership from Samuel Standard be-

cause he committed construction and loan fraud using the 25k home equity loan for purchase and home remodeling in 2006."

In addition, appellant averred in his interrogatory answer: Beginning in August 2004, I purchased auction property to develop as Stone Development, LLC. The LLC owns 5 vacant pieces of Michigan properties for development with another party. My job in August 2004 was to purchase property to develop in Michigan but property value fell due to bad economic times in the Detroit area so I didn't proceed with [the] development project because that would have cost my family money. The contractor that I set my plans with was sued in Indianapolis in September 2006 for fraud on Stone Development. My wife abused me verbally for these failures, as she does in this divorce, stating that I never worked, and that I never did anything. It is not true that I did no work. I was working my head off. However, the income was prevented by crime and fraud of others as Bernice knows.

I do not know the current fair market value of these properties. Parcel lots of vacant land are difficult to value. I have produced appraisals of three of these properties. The LLC owns the deed of these properties with Samuel J. Standard. The purpose of the law suit is to obtain complete ownership from Samuel Standard because he committed construction and loan fraud using the 25k home equity loan for purchase and home remodeling in 2006.

At trial, appellee ascribed "[a]bout the same value" to Stone Development as did appellant in his answer to Interrogatory 9. She explained that the value was based on the "assessments that we received." In addition, appellee opined that the Notley Road home was valued at $720,000.

Appellee testified that the parties own a 2002 Lexus, which was in appellant's possession. According to appellee, she was paying $635 per month for the car, which she valued at $28,000, and which had an outstanding loan balance of $22,192.84. In addition, appellee testified about a joint Vanguard account, which she valued at approximately $32,000 as

of March 31, 2008. Appellee and appellant also owned an E-trade account, which appellee valued at $38,746.12 as of March 31, 2008; a Janus IRA account titled to appellant, which appellee valued at $9,916.05 as of July 27, 2007; and a TIAA–CREF account titled to appellant, which appellee valued at $32,805.17 as of July 27, 2008. While appellee acknowledged that the Janus and TIAA–CREF accounts were marital property, she indicated that the contributions toward those accounts came from her salary.

In their Joint Statement, the parties listed nineteen items as marital property, including Stone Development and appellee's medical practice. Appellant claimed a total fair market value of $1,199,519 for the marital property, while appellee claimed a value of $510,675.33. Appellant asserted that Stone Development was titled to him, while appellee asserted it was jointly titled. Appellant represented that Stone Development had a fair market value of zero, while appellee claimed it had a fair market value of $294,600. Appellant valued his wife's medical practice at $1,000,000; appellee valued it at zero.

With respect to the eight items that the parties agreed were titled to appellant, Mr. Brown represented that they had a combined fair market value of zero. In contrast, appellee assigned the items a value of $66,670.92.

The 9–207 Statement also included many items that the parties agreed were not marital property, including the Notley Road home. The parties agreed that all of these items were titled to appellee, with the exception of the Notley Road home, which they designated as "Joint." Appellant assigned a total fair market value of $1,344,073.60 for the non-marital property, while appellee valued it at $1,991,003.49.

Appellee testified that the items classified as "non-marital" were so designated because "[she] purchased all those before [she] got married." In addition, the 9–207 Statement included a column that was titled "Reason Why Non–Marital." The word "Pre–Marital" was used for each of the non-marital items. However, as we discuss in more detail, *infra*, with respect to the Notley Road property, the printed word "Pre–

Marital" was crossed out by Joel R. Zuckerman, one of appellant's attorneys; he handwrote "By Agreement" in the same box, along with his initials, "JRZ." Directly below those initials are the handwritten initials "DR/By JRZ," indicating that Zuckerman signed for Darin Rumer, one of appellee's attorneys.

Appellee purchased the home on Notley Road in 1994 for $444,000, with a mortgage of $399,600. At the time of the marriage on June 1, 1999, the mortgage balance was $345,079.30. According to appellee, on February 27, 2002, she signed a quitclaim deed, a copy of which was introduced, changing title to the home from her name alone to both parties, as tenants by the entirety. Appellee claimed that appellant insisted that she add his name to the title. In the Joint Statement, the parties agreed that the mortgage balance on the home was $350,539.41, which included a "2nd Trust of $53,000," i.e., a home equity loan. Appellee explained that, at the time she added appellant's name to the title, there was no home equity loan drawn on the property. Appellee testified that appellant used $25,000 of the home equity loan proceeds to purchase an investment property for Stone Development, and $3,000 represented interest, late fees, and penalties. But, she did not know what appellant did with the remaining $25,000.

As to the parties' Notley Road residence, the following testimony is relevant:

[APPELLEE'S COUNSEL]: Was there ever any agreement between the two of you that this would was [sic] considered non-marital property?

[APPELLEE]: No.

&ast; &ast; &ast;

[APPELLEE'S COUNSEL]: Dr. Brown, at the time of the refinance, at the time that you put your husband's name on the mortgage, on the deed as tenants by the entireties. Did the two of you sign any kind of an agreement relating to the home?

[APPELLEE]: No.

[APPELLEE'S COUNSEL]: Did the two have any verbal agreements relating to the character or the nature of the ownership, marital or not, of the home?

[APPELLEE]: No. We did not.

[APPELLEE'S COUNSEL]: At any time since the tenancy by the entirety was established, did you and your husband sign any agreement relating to the nature of marital versus non-marital interest in the home?

[APPELLEE]: No.

\* \* \*

[APPELLEE'S COUNSEL]: And sitting here today, is there any agreement that you're aware of with regard to the home being not marital?

[APPELLEE]: No.

[APPELLEE'S COUNSEL]: And, in fact, from the time that you married Mr. Brown in 1999, how were the mortgage payments paid?

[APPELLEE]: The mortgage payments were paid from my salary. The sole contributor was myself.

[APPELLEE'S COUNSEL]: Any agreements that your salary was not going to be marital property?

[APPELLEE]: No.

Appellee testified that she was asking the court to transfer title of the Notley Road home to her. Further, she indicated that she wanted the court to grant a monetary award to her, in recognition of her non-marital interest in the home, prior to the marriage. She also claimed that she was seeking a monetary award because she made all of the mortgage payments and the tax payments for the parties' home.

In addition, appellee testified that, in connection with the divorce proceedings, she incurred attorney's fees of $26,442.97. She claimed that she incurred additional charges because appellant "failed to produce documents that were requested and extra work had to be done to obtain those documents," and because appellant sought to avoid his deposition and then failed to attend.

Richard Owens, a real estate appraiser, was called by appellee. He opined that the value of the Notley Road home was $720,000 as of May 3, 2008.[9] His appraisal report was introduced into evidence.

The court issued a Memorandum Opinion and Order on May 23, 2008 (entered June 4, 2008). The trial court granted appellee an absolute divorce based on appellant's "cruelty and excessively vicious conduct." It stated:

> Bernice testified exhaustively about the nature of the mental and physical abuse perpetrated on her by Samuel throughout the course of the marriage. She testified as well that there is no reasonable expectation of reconciliation. There is no need to recount the many instances of physical and mental violence she suffered at the hands of her husband. The court finds as a first level fact that Bernice is a credible witness and an accurate reporter of events. Her testimony on the issue of cruelty and excessively vicious conduct by Samuel was corroborated by two police officers, as well as documentary evidence.[ ]

Notably, the court determined that the Notley Road home was not marital property, based on the parties' Joint Statement. Nevertheless, the court ordered that "title to the Notley Road property be transferred to Bernice under § 8–205(a)(2)(iii)(1) of the Family Law Article."

Further, the court found that the total current value of all marital property, less marital debt, was $408,334.38.[10] Of that sum, the court valued Stone Development at $259,621, and then deducted debt of $25,000, leaving a net value of $234,621. In assigning that value, the court relied on appellant's answer to appellee's Interrogatory 9, stating: "This answer is an

---

**9.** Appellant's counsel stipulated that Owens was qualified to give an opinion as to the value of the Notley Road property.

**10.** In particular, appellant claims that $202,936.19 was titled to appellee, and $205,398.19 was titled to him.

admission and is substantive evidence of the fact admitted. . . . It also is a proper opinion of value by an owner of property who was active in its acquisition and development."

With respect to appellee's request for a monetary award, the court considered all of the statutory factors enumerated in F.L. § 8–205(b)[11] and granted appellee a monetary award of $215,000.[12] It reasoned, in part:

*Factor 1:*

---

**11.** F.L. § 8–205, titled "**Marital property—Award,**" provides, in part:

(b) *Factors in determining amount and method of payment or terms of transfer.*—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in property described in subsection (a)(2) of this section, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in property described in subsection (a)(2) of this section, was acquired, including the effort expended by each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in property described in subsection (a)(2) of this section, or both.

**12.** The text of the court's memorandum opinion stated on page 12 that it was granting a monetary award of $225,000. However, in its conclusion (page 14) the court granted a monetary award of $215,000. Moreover, on June 6, 2008, the clerk entered Judgment of $215,000 in favor of appellee for a "monetary award." Because the parties have not disputed that the award was $215,000, we shall use that sum.

The credible evidence of record is manifest that [appellee] contributed nearly all of the monetary contributions from the inception of the marriage. Although [appellant] is well educated, and a licensed attorney, there is no explanation in the record as to why he did not work during the marriage except for a brief period in Bernice's office as a billing assistant.

The credible evidence of record shows that although [appellant] was capable of gainful employment, [appellant] has been content to live off of the earning capacity of his wife even though he is highly educated and skilled.... Although Samuel created Stone Development LLC, he borrowed against the value of Notley Road to do so, and there is no credible evidence that he ever earned a dime for the family from the venture.

There also is no credible evidence that Samuel made any significant non-monetary contributions to the family.[ ] To the contrary, the credible evidence shows that Bernice made nearly all of the monetary and non-monetary contributions during the marriage. This factor weighs heavily in favor of Bernice.

*Factor 2:*

Both principle [sic] non-cash assets (Notley Road and Stone Development) are jointly owned. Notley Road has a fair market value of $720,000, with a first trust of $350,539.41 and a second trust of $53,000. Stone Development LLC has a fair market value of $259,621. Known debt on this venture is $25,000, leaving a net value of $234,621. As set forth in section 2 of the Rule 9–207 statement, each party has no insignificant marital cash assets. The value of all real property and marital property interests of the parties is roughly equivalent. Bernice does have non-marital case [sic] equivalent assets, described in detail in section 3 of the Rule 9–207 statement, in excess of $1,158,000.

*Factor 3:*

Bernice has her ongoing salary ($150,000) from her medical practice. There is no cogent evidence of record as to

why Samuel cannot currently make an equivalent living or why he has not made any significant earnings for the last ten years. Although Bernice has significant premarital cash assets (primarily retirement accounts), there is no competent evidence that Samuel contributed to the growth of these accounts.

*Factor 4:*

Manifestly, Samuel caused the breakup of the marriage. Here, "the fault determination is obvious." *Simonds v. Simonds,* 165 Md.App. 591 at 622 [886 A.2d 158] (2005) (Adkins, J., concurring).

\* \* \*

*Factor 8:*

In this case, Bernice made all material economic contributions to the Notley Road property. Each party made separate contributions to their retirement accounts.

*Factor 9:*

In this case, Bernice made all material economic contributions to her own retirement account acquired before the marriage. The record is silent on who contributed to Samuel's retirement accounts. As noted earlier, Bernice contributed the down payment for the Notley Road property, and made each and every mortgage payment on the property since its purchase.

\* \* \*

*Factor 11:*

The court finds that the equities of this case militate strongly in favor of transferring title to the Notley Road property to Bernice.[1] She acquired the property in 1994, made the down payment for its acquisition, and made every mortgage payment before and during the marriage. Samuel "invested" $25,000 from the equity in this property in Stone Development LLC, but Bernice made each payment due on the home equity line. In addition, Samuel took $25,000 from the equity line for his personal living expenses and, because he made no payments on the equity line, the

bank imposed $3,000 in late charges and interest. The evidence discloses that Samuel had not paid a penny towards the home equity loan.... [13]

The court also awarded legal fees to appellee of $12,500, stating:

The credible record evidence relating to the statutory factors under §§ 7–107 and 8–214, of the Family Law Article supports some award of attorneys' fees to [appellee]. *See Richards v. Richards*, 166 Md.App. 263, 283–85, 888 A.2d 364 (2005). [Appellant] offered essentially no defense to [appellee's] request for a divorce or the issues regarding marital property (apart from whether Notley Road was marital or non-marital).

His refusal to cooperate in the discovery process lead [sic] the Administrative Judge to issue a preclusion order as a discovery sanction and leave to the trial judge the issue of attorneys' fees under Maryland Rule 2–433(c). In this case, [appellant's] failure to appear for deposition and to produce documents was willful and in bad faith. [Appellant's] conduct during discovery was not substantially justified and, charitably, can be characterized as deliberately obstructive.

\* \* \*

The court has carefully reviewed the detailed time entries submitted by [appellee's] counsel. Having reviewed counsel's bills, and having made an independent assessment, the court will award [appellee] legal fees of $12,500.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant challenges the court's transfer of title to the Notley Road home to appellee. Before addressing the parties'

---

13. The court deemed the duration of the marriage "relatively long-standing" but neutral (Factor 5); found the parties' ages neutral (Factor 6); found both parties in good health (Factor 7); and did not address or award alimony (Factor 10).

contentions, it is helpful to review in more detail what transpired below.

Appellant initially characterized the Notley Road home as marital property on his proposed 9–207 Statement, filed on February 14, 2008. Appellee introduced that statement into evidence. However, at trial appellant's attorney contended that the parties' counsel ultimately entered into a binding agreement, contained in the final Rule 9–207 Statement, filed May 1, 2008, to the effect that the marital residence was non-marital, notwithstanding that the parties held title as tenants by the entirety. Appellee's counsel disagreed.[14] This dispute consumed a great deal of the court's attention.

The following colloquy is pertinent:

THE COURT: ... Well, let me just ask counsel, why would Section 8–201(e)(2) of the Family Law Article, which defines marital property. It says, "Marital property includes any interest in real property, held by the parties as tenants by the entirety unless the real property is excluded by valid agreement."

Why would that statutory section not be largely, if not completely, dispositive of the question?

[APPELLANT'S COUNSEL]: Because there is a valid agreement.

THE COURT: And the valid agreement is?

[APPELLANT'S COUNSEL]: The 9–207 statement.

THE COURT: All right. So your position ... is the marital property statement. ... That's the valid agreement that you're referencing to take this real estate out of the general rule of 8–201(e)(2).

[APPELLANT'S COUNSEL]: Yes.

\* \* \*

---

**14.** Each party had two attorneys. Appellee was represented by Linda Haspel and Darin Rumer, while appellant was represented by Joel Zuckerman and James Maxwell. We will refer to the attorneys by name only when necessary for clarity.

THE COURT: And you say that's not true. That's not what you agreed to. And you're saying it's not the kind of valid agreement referred to in the statute, etcetera.

[APPELLEE'S COUNSEL]: Right. And assuming they think that there is an agreement, there was no meeting of the minds, so there is no agreement. That is our position.

The court initially indicated that it was not bound by the parties' characterizations of property on the 9–207 Statement, noting that "the court has to decide whether something is marital or non-marital." But, appellant's counsel insisted that the court is "stuck" with the parties' agreement as reflected on the 9–207 Statement. He posited: "The reason for the 9–207 is to narrow the issues for the Court, which is what we believe we were doing."

Appellee's counsel disputed that the 9–207 Statement was "binding" on the court. Moreover, she referred to her proposed 9–207 Statement, sent to appellant's counsel about a week before trial, in which she listed the home as "disputed," and "[n]ot as non-marital," and recalled that appellant's counsel responded: " 'We're going to stipulate that we have no claim to it and it's not marital and we're not asking for anything.' " The court said: "What he's saying is it's not marital and because it's not marital and he's agreeing it's not marital, the Court can't put it in the pot, if you will, as part of the determination of whether and the extent to which to make a monetary award." Appellee's counsel answered: "It's marital." But, she also asserted that, at the very least, 21.57% of the asset was not marital, because the home was acquired by appellee before the marriage.

The following exchange is pertinent:

[APPELLEE'S COUNSEL]: . . . You have heard absolutely no evidence that the marital home is not marital property. You heard Dr. Brown testify, she transferred as tenants by the entirety, that there were never any agreements written or oral, nothing.

So now what [appellant's counsel] wants to do is he wants to say that the 9–207 statement, which we don't agree what it means, means that the house is not marital property. THE COURT: You're saying that notwithstanding the passing of all the various papers, etcetera, that at the end of the day there's not sufficient credible evidence for the Court to conclude there was mutual assent and a meeting of the minds and consequently there was no contract and therefore there is no valid agreement under the statute? [APPELLEE'S COUNSEL]: Correct. And no stipulation either. Because there was a dispute between counsel about what this means. * * * And there is no valid agreement. And this is real property. We need something in writing. I don't think the 9–207 statement, which nobody seems to agree what it means is going to rise to the level of saying that the marital home is not marital property.

Appellant's counsel argued:

A couple of things about the house, Your Honor. Maryland follows the objective law [of] contract. It is from an objective point of view, looking at that 9–207 statement, it's clear that the parties' intention was to exclude that property.... I don't think that the Court can do anything. It's not marital property....

Referring again to the 9–207 Statement, the court inquired: "And what it says, it's ambiguous, is it not? On page four, description of property, Notley Road, and then it says, by agreement. It doesn't say what the agreement is. It doesn't say anything. It just says, by agreement. By agreement what?" According to Zuckerman, appellee's counsel "acquiesced" to characterizing the home as non-marital, and therefore the court lacked "the power" to transfer title to appellee. He explained:

I called them up and I said, we wanted to put by agreement underneath it and they said fine. Go ahead and do that. And I did. I spoke with Mr. Rumer that day and it wasn't because we were giving up an interest in the home. We can't give up his interest. It's tenants by an entirety. And

he can't just walk away from that. The house to be re-titled as tenants [in] common upon divorce and that would be, the parties would have this asset together moving forward.

Mr. Maxwell elaborated:

> The first point is that the joint statement is not an attempt by the parties to proffer to the Court their characterization of property under one or the other. It is actually an agreement, they reach agreement in some respects, whether they're right or wrong, with respect to the category of non-marital.
>
> The statute itself permits parties to agree that property which otherwise would be marital without any question to be treated as non-marital.
>
> \* \* \*
>
> Parties have a right to exclude property from consideration as marital property. . . .
>
> \* \* \*
>
> The issue here is not whether we have properly characterized it and therefore placed it into category two. The issue is whether we have agreed, not an issue, we did agree the operative instrument is this.
>
> \* \* \*
>
> Our position just succinctly put is that attorneys, as agents of principals acting within the scope of their authority, as required by rule, using the language that the rule requires, enter into an agreement, stipulation, call it what you want.

The court asked: "So you're saying it's more than an admission. It's a binding contract and unless there are good and valid reasons under [the] law of contracts . . . ." Mr. Maxwell answered, "Yes. I would say that—." He added: "[T]here was a deed to them as tenants by the entirety. . . . Under the law, under this particular section, the definition of marital property under 8–201 provides that property of tenants by the entirety is marital property, unless excluded by valid agreement like this."

Appellee's counsel again insisted: "It's marital property." Moreover, she claimed that the 9–207 Statement was "[a]bsolutely" ambiguous, was "not a binding agreement" or a stipulation, and was, instead, "a roadmap to help the Court." Asserting that appellant's counsel had assured her he was "going to waive any claim" to the Notley Road home, Ms. Haspel argued: "I guess it's a factual issue. Because I will tell you that the[r]e was no agreement that this was not marital property...." In addition, she claimed that the handwritten words "By agreement" were added by appellant's counsel without her approval. Appellee's lawyer also claimed that, under F.L. § 8–205, the court could transfer ownership in a jointly titled principal residence, even if it is not marital.

The following exchange is pertinent:

[APPELLEE'S COUNSEL]: ... Now, we still believe that the Notley Road property titled tenants by the entirety under statute is marital property and we still—

THE COURT: Unless excluded by a valid agreement.

[APPELLEE'S COUNSEL]: And we contend there is no valid agreement.

\* \* \*

THE COURT: ... So, there's no debate as I see it as to the, but for a valid agreement, you'd be in the marital property hopper and we would go along our merry way.

But now it appears that there was an agreement, so the question is, was there an agreement? It is a valid agreement? And if so, what are the terms?

[APPELLEE'S COUNSEL]: Well, it appears that our understanding was that he was giving up the claim to the house because it was very clear that the majority of the money came from her and from the pre-marital interest and all the money that she earned during the marriage.... That's what we understood.

\* \* \*

THE COURT: And I need to decide it. I don't have the factual record to decide it. We'll have to schedule some-

thing and we'll do it soon. Was there an agreement? If so, what are its terms? Because what will flow, flows from there.

[APPELLEE'S COUNSEL]: Okay. And as you heard from testimony from the plaintiff, no agreement; she's not aware of any agreement; there was no agreement.

THE COURT: I heard what she said, but I also have to, I can't ignore the writing that's staring at me. It says agreement. All the lawyers signed it.

[APPELLEE'S COUNSEL]: Well, actually, we didn't sign those. Mr. Zuckerman initialed it.

THE COURT: Well, but if he signed it with assent, I mean, you know, we frequently as a courtesy, we're given permission by opposing counsel to sign their name and we sign their name, we put a slash and put the initials so nobody thinks we're trying to snucker anybody.

\* \* \*

[APPELLEE'S COUNSEL]: The assent to this, such as it was, was predicated on the understanding that he was not going to be pursuing this asset. That this was now recognized as our client's asset.

The court determined to hold an evidentiary hearing so that it could "find facts." The court explained: "I can't do it just based on you say, they say, because what you're saying is so different that you both can't be right." Accordingly, the court held an evidentiary hearing on May 13, 2008.

Cosma Spassiani, a paralegal in the office of appellee's attorneys, testified that what he regarded as the final version of the Joint Statement was hand delivered on May 1, 2008, "for Mr. Zuckerman's signature." He then received a phone call from Zuckerman, who asked to speak to Rumer. Spassiani explained:

Mr. Zuckerman indicated that in our previous conversation, he had requested edits and he forgot to request an additional addition to the 9–207 statement. He apologized and said it had slipped his mind, and said that he wanted the term

"by agreement" to be added to the 9–207 statement with reference to the marital home or the home of the parties.

Spassiani told Zuckerman that "Rumer was with a client" and that Zuckerman would have to "speak to Mr. Rumer and get his approval." When asked if Zuckerman said anything to him "about striking the word 'premarital' [on the 9–207 Statement] and replacing it with any other words," Spassiani replied: "No, he indicated that he wanted to make an addition, a replacement or a redaction."

Spassiani relayed Zuckerman's message to Rumer, who instructed Spassiani to inform Zuckerman "that the term 'by agreement' could be added as long as it was added as a footnote to that portion of the 9–207 statement." Spassiani "conveyed" that information to Zuckerman, who told him that "he wasn't going to write it in a footnote, but just write it in the box to make it quicker." According to Spassiani, there was no communication between counsel "after the 9–207 statement left our office." Spassiani was asked: "Did Mr. Zuckerman ever speak to Mr. Rumer and get his authority, as far as you know, to strike 'premarital' and replace it with the word 'by agreement'?" He answered, "No."

Monica Rager testified that she was the person who delivered the 9–207 Statement to Zuckerman on May 1, 2008, and there were "no handwritten marking or initials" on the document. She recalled that Zuckerman told her he needed to speak to Rumer, but Rumer was with a client. After Zuckerman received a call from Spassiani, Zuckerman "signed the paper." Thereafter, she and Zuckerman's legal assistant filed the 9–207 Statement.

Linda Linden, another paralegal employed by appellee's attorneys, agreed that she was "part of the creation of the last version [of the 9–207 Statement] that then got delivered to Mr. Zuckerman's office." She indicated that Rumer received a letter from Zuckerman, dated April 25, 2008, "attaching what is titled 'Plaintiff's Proposed Statement Concerning Marital and Non-marital Property' in which Mr. Zuckerman made some handwritten modifications to that statement, which we

had originally sent over to him a day or two prior." That version of the 9–207 Statement was also admitted into evidence.

The Notley Road property initially appeared on that 9–207 Statement as non-marital property; it was deemed "Pre– Marital." Linden noticed that Zuckerman had inserted a handwritten footnote on the bottom of the page, concerning stock, mutual funds, and retirement accounts. Because "it appeared that there was a dispute based on the footnote" added by Zuckerman, Linden "moved all of the items in No. 2 [non-marital] into 'Disputed Property'" [Section 3]. Linden faxed it to appellant's counsel at 11:56 a.m. on May 1, 2008.

According to Linden, she was then "instructed to move the items that were in Section 3 [disputed] back up to Section 2 [non-marital]," because she "understood that Mr. Zuckerman wanted all of the assets moved back up to the premarital section." It was her "understanding [that] there was an agreement that those were Dr. Brown's premarital assets," which included the Notley Road property. When asked if Zuckerman spoke to her on May 1, 2008, with respect to the Notley Road property, "regarding crossing out the word 'premarital' and changing it to 'by agreement,'" Linden answered: "No."

Darin Rumer testified that, as of the morning of May 1, 2008, the Notley Road property was listed as "disputed" on the Joint Statement. Mr. Brown's counsel called Rumer and "said something to the effect of 'What are you doing? Are you trying to pull something? Everything [on the 9–207] is in Category 3 [disputed]?'" Rumer replied: "'Yes it's disputed. Your client is claiming a monetary award for these items.'" According to Rumer, Brown's attorney responded: "'We're not disputing that it's your client's premarital property, move it all back to 2 [non-marital].'" Rumer explained that the request of appellant's counsel "made sense [because appellant] could no longer receive a monetary award [due to the discovery sanction], his only claim was of marital interest, so, you know, it just seemed to make sense to move it all back to

premarital." Linden then moved the house to non-marital property and faxed the revised version to appellant's counsel. Rumer added that the house was listed as "non-marital" because it "was acquired by one party before the marriage," and "it's not marital by virtue of being a premarital asset."

Sometime later on May 1, Rumer's paralegal notified him that Mr. Brown's counsel had called and "wanted to make a change." Rumer testified that he instructed his paralegal to have Mr. Brown's counsel "put [the change] in a footnote." However, Rumer claimed that appellant's counsel changed the final Rule 9–207 Statement, without permission. Although the Notley Road property was in the "non-marital" category, it had been designated as "Pre Marital"; Zuckerman struck the word "premarital" and added the words "by agreement."

Nevertheless, Rumer agreed that appellee had designated the property as non-marital in her earlier proposed Rule 9–207 Statement, which she filed on February 11, 2008. But, he claimed: "It's a marital asset by virtue of being T–by–E, tenant's [sic] by the entirety. Our client's claim is to how it should be divided as though it's premarital." According to Rumer, "[appellee's] position has been the same throughout, even in her pleadings, that she had a premarital interest in the home." Further, Rumer testified that he and appellant's counsel "had a meeting of the minds, it was premarital."

The following exchange is also pertinent:

THE COURT: Your position was that the Notley Road property was premarital?

[MR. RUMER]: Correct.

THE COURT: That was your position. Right, wrong or indifferent, that was your position.

[MR. RUMER]: T–by–E, but she had a premarital interest.

THE COURT: I understand. You sent it over to Mr. Zuckerman's. He looked at it. He talked to your paralegal. Your response to whatever it was that Mr. Zuckerman said was "Stick it in a footnote." Is that fair?

[MR. RUMER]: Correct.

THE COURT: Did you and Mr. Zuckerman have an agreement as to the status of the Notley Road property? Did you have a meeting of the minds?

[MR. RUMER]: When we—yes. When we had a meeting of the minds, it was premarital.

As noted, in its Memorandum and Order of May 23, 2008, the court found that the Notley Road property was not marital property. It said:

The principal item in dispute is the parties' marital home, located at 15009 Notley Road, Silver Spring, Maryland.

When the General Assembly amended the Marital Property Act in 1994 (after *Grant v. Zich,* 300 Md. 256 [477 A.2d 1163] (1984) and *Watson v. Watson,* 77 Md.App. 622 [551 A.2d 505] (1989)), it expressly provided that any real estate held as tenants by the entirety during the marriage is marital property, as long as the property was so owned by the parties after the effect date, October 1, 1994. . . . Hence, the residence is marital property unless it has been excluded by a valid agreement under § 8–201(e)(2) of the Family Law Article. *See Golden v. Golden,* 116 Md.App. 190, 202–03 [695 A.2d 1231] (1997); *Falise v. Falise,* 63 Md.App. 574, 581 [493 A.2d 385] (1985).

At trial, Samuel (through counsel), in response to a question from the court, agreed that the marital residence is marital property as defined by § 8–201(e)(2) of the Family Law Article unless "excluded by valid agreement."[1] This concession, made in open court, is binding on Samuel. *Prince Georges Properties, Inc. v. Rogers,* 275 Md. 582, 587–88 [341 A.2d 804] (1975). *See also Cloverfields Improvement Ass'n, Inc. v. Seabreeze Properties, Inc.,* 280 Md. 382, 403–04 [373 A.2d 935] (1977).

The focus of Samuel's argument that the marital residence is not marital property is the parties' final Rule 9–207 statement. . . .[15] This statement lists the marital residence

---

**15.** Maryland Rule 9–207, titled "**Joint statement of marital and nonmarital property**," states, in 9–207(a): "**When required.** When a

in section 2 of the Rule 9–207 statement, which says: "The parties agree that the following property is not marital property . . ." The first item listed in section 2 is the Notley Road property. Although he had initially characterized the marital residence as marital property in an earlier filing . . . Samuel contended at trial that counsel for both parties ultimately agreed in the final Rule 9–207 statement, filed with the court on May 1, 2008, that the subject real estate was non-marital. According to Samuel, the final Rule 9–207 statement is a "valid agreement" within the meaning of § 8–201(e)(2) of the Family Law Article.

Bernice disagrees for several reasons. First, Bernice notes that she testified at trial that the residence was marital property, pointing to the quit claim deed to Samuel during the marriage in 2002, which changed title from fee simple to tenants by the entirety. Second[,] Bernice's counsel and paralegals testified (at the May 13, 2008 proceeding) that they listed the property on the Rule 9–207 statement as non-marital for the reason that the house was "pre-marital." That is, because the house initially was acquired (and paid for) by Bernice before the marriage. Bernice's characterization of the reason why the property was non-marital was not accepted by Samuel's counsel, who inserted the words "by agreement" on the Rule 9–207 statement without the consent of Bernice's counsel. Bernice's counsel testified that although he gave Samuel's counsel permission to place a footnote on the statement, he did not agree that the Notley Road property was non-marital by reason of an "agreement" between the parties. Samuel's counsel did not testify regarding his "amendment" of the Rule 9–207 statement.

---

monetary award or other relief pursuant to Code, Family Law Article, § 8–205 is an issue, the parties shall file a joint statement listing all property owned by one or both of them." Under Rule 9–207(b), "**Form of property statement**," the parties designate which property they agree is marital, which property they agree is not marital (including property "excluded by valid agreement"), and property for which there is a dispute.

The parties (actually their counsel) certainly have muddied the waters and have presented the court with a dilemma. In one sense, Bernice has amply demonstrated[1] that the Notley Road [property] was marital because it was held by the parties as tenants by the entirety during the marriage on the date of trial.... But the parties' joint Rule 9–207 statement specifically classified the Notley Road property as non-marital. Although the parties disagree as to the reasons why each characterized Notley Road as non-marital, this is a distinction without legal significance.[1] As a matter of contract construction, the Rule 9–207 statement is not ambiguous. Consequently, "we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran v. Norkunas,* 398 Md. 1, 16 [919 A.2d 700] (2007) (footnote omitted). *See also Painewebber [Paine-Webber] Inc., v. East,* 363 Md. 408, 414 [768 A.2d 1029] (2001).

Moreover, the Rule 9–207 statement filed in this case is a stipulation of fact by the parties through their counsel. *See Beck v. Beck,* 112 Md.App. 197, 205–08 [684 A.2d 878] (1996), "The actions of an attorney within the scope of his employment are binding upon his client under ordinary principles of agency." *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 45 [300 A.2d 367] (1973).[1] ...

In summary, because of the joint Rule 9–207 statement filed in this case, the court cannot regard Notley Road as marital property because it has been excluded by a valid agreement.[16]

Nevertheless, the court relied, *inter alia,* on F.L. § 8–205, which was amended in 2006 by Senate Bill 353, as well as the Fiscal and Policy Note explaining Senate Bill 353, to conclude that "the court has the authority to transfer title" to real property jointly owned by the parties and used as the principal residence of the parties during the marriage, "regardless

---

16. The court noted that appellee's counsel never sought leave to amend the Rule 9–207 Statement.

of whether the realty is marital or non-marital property." It reasoned:

In 2006, the General Assembly amended § 8–205(b) of the Family Law Article to permit the court to transfer title to "real property jointly owned by the parties and used as the principle [sic] residence of the parties when they lived together." Chapter 431, Acts 2006. The Fiscal Note, which explains Senate Bill 353, makes it clear that the court has the authority to transfer title regardless of whether the realty is marital or non-marital property. This is confirmed by § 8–205(a) of the Family Law Article, which permits the court to transfer an ownership interest in the property specified in subsection (b), "grant a monetary award, or both. . . ."

As we have seen, the court also said:

The court finds that the equities of this case militate strongly in favor of transferring title to the Notley Road property to Bernice.[1] She acquired the property in 1994, made the down payment for its acquisition, and made every mortgage payment before and during the marriage. Samuel "invested" $25,000 from the equity in this property in Stone Development LLC, but Bernice made each payment due on the home equity line. In addition, Samuel took $25,000 from the equity line for his personal living expenses and, because he made no payments on the equity line, the bank imposed $3,000 in late charges and interest. The evidence discloses that Samuel had not paid a penny towards the home equity loan.

Turning to the parties' contentions, appellant maintains that, given the trial court's finding that the home was not marital property, the trial court lacked authority under F.L. § 8–205(a)(2)(iii) to transfer title to the parties' home to appellee. He notes that, under F.L. § 8–201(e)(3)(iii), marital property does not include property "excluded by valid agreement," and insists that F.L. § 8–205(a) permits a transfer of title only as to marital property, in order to accomplish the statutory objective of "an adjustment of the equities and right

of the parties concerning marital property." Appellant argues:

> Where, as here, divorcing parties specifically agree that their former marital home, although owned as tenants by the entirety, is not to be treated as marital property, that home is immunized against an ordered Family Law Article § 8–205(a)(2)(iii) transfer, the clear and express language of which limits it [sic] application to transactions contemplated "as an adjustment of the equities and rights of the parties concerning marital property."

\* \* \*

> The statutory language here in question is entirely contained within a section of the Family Law Article itself entitled " § 8–205. Marital Property—Award.", and appears to exist for the sole purpose of applying the equitable distribution schema set forth in Title 8, Subtitle 2, of the Family Law Article, which requires the adjustment of the equities and rights of the parties *concerning marital property*.

Urging us to uphold the trial court's decision, which was based on " '[t]he equities,' " appellee points out that appellant "cites no law to support his position." Further, she observes that "the Trial Court found that Notley Road would have been marital property pursuant to Family Law Article Section 8–201(e)(2), [but] determined that the parties' Rule 9–207 Statement constituted a valid agreement which excluded the Notley Road home from being marital property."

As our factual summary reflects, in the proceedings below appellee took various positions as to the Notley Road home. She initially sought to characterize the home as premarital, explaining that she bought it years before the marriage and appellant never contributed to the mortgage or expenses.[17] She also maintained that appellee's counsel had agreed that the home belonged to her. However, she also testified that

---

17. As we discuss, *infra,* property that is acquired before marriage is generally not marital property. *See* F.L. § 8–201(e)(3)(i).

the home was marital property, and disputed that the parties agreed in the 9–207 Statement that the home was non-marital. Notably, appellee does not contend on appeal that the court was clearly erroneous in its factual finding that, pursuant to the 9–207 Statement, the parties agreed the home was non-marital. Therefore, that finding is not in issue.[18]

Given the court's finding that the Notley Road property was rendered non-marital by agreement of the parties in their 9–207 Statement, we must determine whether the court erred in transferring title to the home from appellant to appellee, pursuant to F.L. § 8–205. The parties present conflicting interpretations as to the meaning of the statute, which states:

### § 8–205. Marital property—Award.

(a) *Grant of award.*—(1) Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in property described in paragraph (2) of this subsection, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded.

(2) The court may transfer ownership of an interest in:

---

**18.** An agreement in a Rule 9–207 Statement that property is non-marital removes that property from the pool of property that is subject to division for purposes of a monetary award. As we explained in *Flanagan v. Flanagan,* 181 Md.App. 492, 532, 956 A.2d 829 (2008), "an agreement reflected in a joint statement under Rule 9–207, to the effect that the parties have resolved the disposition of certain marital property, serves to render that property non-marital, pursuant to F.L. § 8–201(e)(3)(iii)." The rule facilitates the chancellor's decision-making by clarifying, before trial, areas of dispute and agreement between the parties. *See Flanagan,* 181 Md.App. at 531, 956 A.2d 829 ("If it were otherwise, the purposes underlying Rule 9–207 would be thwarted, because the parties' joint statement would not narrow the issues before the chancellor."); *Beck v. Beck,* 112 Md.App. 197, 208, 684 A.2d 878 (1996) (construing Rule S74, the predecessor to Rule 9–207, and concluding that "the admissions and stipulations contained in Maryland Rule ... S74 Statements, when filed in a case as required, may be considered as evidence by trial courts without the necessity of a formal introduction of such statements at trial"), *cert. denied,* 344 Md. 717, 690 A.2d 523, *and* 345 Md. 456, 693 A.2d 354 (1997).

(i) a pension, retirement, profit sharing, or deferred compensation plan, from one party to either or both parties;

(ii) subject to the consent of any lienholders, family use personal property, from one or both parties to either or both parties; and

(iii) subject to the terms of any lien, real property jointly owned by the parties and used as the principal residence of the parties when they lived together, by:

1. ordering the transfer of ownership of the real property or any interest of one of the parties in the real property to the other party if the party to whom the real property is transferred obtains the release of the other party from any lien against the real property;

2. authorizing one party to purchase the interest of the other party in the real property, in accordance with the terms and conditions ordered by the court; or

3. both.

As indicated, appellant claims that the court lacked authority to transfer title to the home because, by virtue of the parties' agreement in the 9–207 Statement, they excluded it from the pool of marital property, thereby eliminating it from the scope of F.L. § 8–205(a)(2)(iii)(1). Conversely, appellee argues that the reach of F.L. § 8–205(a)(2)(iii)(1) extends to the parties' principal residence, owned TBE, even if the parties characterized the home as non-marital on their 9–207 Statement. Neither side cites any authority to support their respective positions, nor have we uncovered any reported appellate case addressing this issue.

We begin our analysis with a review of Title 8, Subtitle 2 of the Family Law Article, which governs property disposition in divorce proceedings. Marital property is defined as "property, however titled, acquired by 1 or both parties during the marriage." F.L. § 8–201(e)(1). Pursuant to F.L. § 8–201(e)(2), marital property "includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement." Under F.L. § 8–201(e)(3), marital property does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) *excluded by valid agreement;* or

(iv) directly traceable to any of these sources. (Emphasis added.)

■ When the division of *marital* property by title is inequitable, the chancellor may adjust the equities by granting a monetary award. *Flanagan v. Flanagan,* 181 Md.App. 492, 534–35, 956 A.2d 829 (2008); *see Long v. Long,* 129 Md.App. 554, 579, 743 A.2d 281 (2000) (recognizing that the judge has "all the discretion and flexibility he needs to reach a truly equitable outcome"). In *Ward v. Ward,* 52 Md.App. 336, 339–40, 449 A.2d 443 (1982), we elucidated the concept of the monetary award:

> The monetary award is ... an addition to and not a substitution for a legal division of the property accumulated during marriage, according to title. It is "intended to compensate a spouse who holds title to less than an equitable portion" of that property.... What triggers operation of the statute is the claim that a division of the parties' property according to its title would create an inequity which would be overcome through a monetary award.

(Citation omitted) (Emphasis omitted).

■ If a party petitions for a monetary award, the trial court must undertake "a three-step process which may culminate in a monetary award." *Alston v. Alston,* 331 Md. 496, 499, 629 A.2d 70 (1993); *see* F.L. §§ 8–203 to 8–205; *see also Gordon v. Gordon,* 174 Md.App. 583, 623–24, 923 A.2d 149 (2007); *Ware v. Ware,* 131 Md.App. 207, 213, 748 A.2d 1031 (2000). First, for each disputed item of property, the court must determine whether it is marital or nonmarital. F.L. § § 8–201(e)(1), 8–203, 8–205(a)(1); *Flanagan,* 181 Md.App. at 519, 956 A.2d 829. Second, the court must determine the value of all *marital* property. F.L. §§ 8–204, 8–205(a)(1); *Flanagan,* 181 Md.App. at 519, 956 A.2d 829. Third, the court must decide *if the division of marital property* according to title would be unfair. If so, the chancellor may make a monetary award to rectify any inequity " 'created by the way in which property acquired during marriage happened to be

titled.' " *Id.* at 520, 956 A.2d 829 (quoting *Doser v. Doser,* 106 Md.App. 329, 349, 664 A.2d 453 (1995)); *see* F.L. § 8–205(a); *Long,* 129 Md.App. at 578–79, 743 A.2d 281.[19]

To be sure, the statutory scheme reflects that title is not controlling in terms of a monetary award. But, it is only *marital property* that is subject to equitable distribution by way of a monetary award. The Notley Road home is titled TBE. Real property that is owned TBE is generally marital property. However, F.L. § 8–201(e)(2) expressly provides that real property held TBE is marital, "unless . . . excluded by valid agreement." And, the court below found such an agreement in the 9–207 Statement. Therefore, the home was classified as non-marital property.

F.L. § 8–205 was amended in 2006 by Chapter 431, Acts of 2006; the General Assembly added § 8–205(a)(2)(iii) to the Family Law Article, effective October 1, 2006. The text of F.L. § 8–205(a) does not specifically say that title to jointly held real property may be transferred only if it is marital property.

The court below found authority for the transfer of title in a portion of the Fiscal and Policy Note (Revised) for Senate Bill ("S.B.353"). It provided:

---

19. "Ordinarily, it is a question of fact as to whether all or a portion of an asset is marital or non-marital property." *Flanagan,* 181 Md.App. at 521, 956 A.2d 829. The value of each item of marital property is also a question of fact. *Id.* We review these factual findings under the clearly erroneous standard. *See* Rule 8–131(c); *Flanagan,* 181 Md.App. at 521, 956 A.2d 829; *Noffsinger v. Noffsinger,* 95 Md.App. 265, 285, 620 A.2d 415, *cert. denied,* 331 Md. 197, 627 A.2d 539 (1993).

In deciding whether to make a monetary award, and, if so, the amount, the court is required to consider the statutory factors set forth in F.L. § 8–205(b)*. See* note 11, *supra; see also Ware,* 131 Md.App. at 213–14, 748 A.2d 1031. However, the statutory factors "are not prioritized in any way, nor has the General Assembly mandated any particular weighing or balancing of the factors." *Alston,* 331 Md. at 507, 629 A.2d 70. The ultimate decision regarding whether to grant a monetary award, and the amount of such an award, is subject to review for abuse of discretion. *Id.* at 504, 629 A.2d 70; *Flanagan,* 181 Md.App. at 521, 956 A.2d 829; *Malin v. Mininberg,* 153 Md.App. 358, 430, 837 A.2d 178 (2003); *Chimes v. Michael,* 131 Md.App. 271, 282–83, 748 A.2d 1065, *cert. denied,* 359 Md. 334, 753 A.2d 1031 (2000).

This bill provides that in a divorce or annulment proceeding, a court may transfer, subject to the terms of any lien, *ownership of an interest in real property jointly owned by the parties,* and used as the principal residence of the parties when they lived together, by: (1) ordering the transfer of ownership of the real property or any interest of one of the parties in the real property to the other party if the party to whom the real property is transferred obtains the release of the other party from any lien against the real property; (2) authorizing one party to purchase the interest of the other party in the real property, in accordance with the terms and conditions ordered by the court; or (3) both. (Emphasis added.)

Although not cited by the lower court, we also regard as relevant an additional portion of the Fiscal and Policy Note:

### Analysis

**Current Law:** In an action for annulment or divorce, after the court determines which property is marital property and the value of that property, the court may transfer an ownership interest in specified types of marital property and/or grant a monetary award. The transfer or grant is an adjustment of the equity of the parties regarding the marital property, regardless of an alimony award.

Generally, the court may not transfer the ownership of personal or real property from one party to the other. However, the court is authorized to transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from one party to either or both parties.

\* \* \*

**Background:** Some jurisdictions in the region allow a court to transfer real property or the interest in real property from one party to another in a divorce or annulment action.

(Emphasis added.)

The Floor Report for S.B.353 is also noteworthy. Titled "Family Law—Property Disposition in Annulment or Di-

vorce—Transfer of Real Property," the Short Summary stated: "This Bill Authorizes the Court in a Divorce Action to Transfer Ownership *of Jointly Owned Real Property* Used as the Parties' Principal Residence or to Authorize One Party to Purchase the Other's Interest." (Emphasis added.) The Bill Summary was virtually identical to the text of the Fiscal and Policy Note.

As we have seen, like F.L. § 8–205, neither the Floor Report nor the Fiscal and Policy Note expressly stated that the ability to transfer title was limited to marital property. Both referred only to jointly owned property. Nevertheless, based on the well honed principles of statutory construction, we conclude that the parties' residence, owned TBE, but deemed non-marital by their agreement, was outside the scope of F.L. § 8–205(a)(2)(iii)(1).

" 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.' " *Henriquez v. Henriquez*, 413 Md. 287, 297, 992 A.2d 446 (2010) (quoting *Bowen v. City of Annapolis*, 402 Md. 587, 613–14, 937 A.2d 242 (2007)); see *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18 (2010); *Chow v. State*, 393 Md. 431, 443, 903 A.2d 388 (2006); *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186 (2005). In our effort to effectuate the Legislature's intent, we give the words of a statute their ordinary and usual meaning. *Henriquez*, 413 Md. at 297, 992 A.2d 446; *City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 318, 910 A.2d 406 (2006); *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen*, 366 Md. 336, 350, 783 A.2d 691 (2001). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204 (1994). But, "[w]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. Nations-*

*Bank, N.A.,* 365 Md. 166, 181, 776 A.2d 645 (2001); *see Lonaconing Trap Club, Inc. v. Dep't of Env't,* 410 Md. 326, 339, 978 A.2d 702 (2009); *Chow,* 393 Md. at 443, 903 A.2d 388.

 Of significance here, we are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Green v. Carr Lowery Glass Co.,* 398 Md. 512, 522, 921 A.2d 235 (2007). Put another way, we do not construe the statutory text "in a vacuum," or interpret "the isolated section alone." *Lockshin,* 412 Md. at 275, 987 A.2d 18. Rather, we interpret a provision " 'in the context of the entire statutory scheme of which it is a part.' " *Carroll v. Konits,* 400 Md. 167, 193, 929 A.2d 19 (2007) (quoting *Gordon Family P'ship v. Gar on Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997)); *see State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996) (" 'the meaning of the plainest language is controlled by the context in which it appears' ") (citations omitted). We "presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize" the statute, "consistent" with its "object and scope." *Lockshin,* 412 Md. at 276, 987 A.2d 18. To that end, we may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Briggs v. State,* 413 Md. 265, 275, 992 A.2d 433 (2010) (citation omitted); *see Walzer v. Osborne,* 395 Md. 563, 573, 911 A.2d 427 (2006).

The Court of Appeals has said that there is " 'an ambiguity within [a] statute' " when there exist " 'two or more reasonable alternative interpretations of the statute.' " *Chow,* 393 Md. at 444, 903 A.2d 388 (citations omitted). When a statute can be interpreted in more than one way, " 'the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.' " *Id.* In doing so, we "may employ 'all the resources and tools of statutory construction' " to ascertain its meaning, " 'including legislative history, prior case law, and statutory

purpose.'" *Reier v. State Dep't of Assessments & Taxation,* 397 Md. 2, 27, 915 A.2d 970 (2007) (citations omitted); *see Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470 (2007) (observing that, if a statute is ambiguous, "we will resolve any ambiguity in light of the legislative history, caselaw, and statutory purpose"). Moreover, when faced with an ambiguous statute, " 'courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration].' " *Fraternal Order of Police v. Mehrling,* 343 Md. 155, 174, 680 A.2d 1052 (1996) (citation omitted).

In *Witte v. Azarian,* 369 Md. 518, 525–26, 801 A.2d 160 (2002), the Court explained:

> If the true legislative intent cannot readily be determined from the statutory language alone ... we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

Even when a statute is not ambiguous, we may confirm our construction of it by reference to its legislative history. *MVA v. Jaigobin,* 413 Md. 191, 197–98, 991 A.2d 1251 (2010). As the Court has recognized, " 'in the interest of completeness' we may, and sometimes do, explore the legislative history of the statute under review." *Mayor of Balt. v. Chase,* 360 Md. 121, 131, 756 A.2d 987 (2000) (citation omitted). Where we do so, we "look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Id.* Thus, "the resort to legislative history is a confirmatory process; it is not undertaken to contradict the

plain meaning of the statute." *Id.; see Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49 (1977) ("[A] court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature.").

 As we have seen, the principles elucidated above make clear that we must consider as a whole the statutory scheme concerning the disposition of property in divorce proceedings, and we must avoid a construction of the statute that is at odds with logic and common sense. Here, only marital property is subject to equitable distribution for a monetary award, and the provision at issue here is part of F.L. § 8–205, concerning disposition of marital property. Therefore, it seems logical that the court's ability to transfer title to real property would extend only to real property that is itself marital property.[20]

In looking to the statutory text, F.L. § 8–205(a)(1) states that the court may transfer ownership of an interest in property set forth in (a)(2), which includes the parties' principal residence, but it may do so only *"after"* it determines which property is marital and its value. (Emphasis added.) Applying common sense, it is not happenstance that the statute requires the court to identify the marital property. While F.L. § 8–205(a)(2)(iii) expressly permits a court to transfer ownership of an interest in jointly owned real property, it may do so under F.L. § 8–205(a)(1) only "as an adjustment of the equities and rights of the parties *concerning marital property.*" (Emphasis added.) In its ruling, the court below omitted any reference to the clause highlighted above, which clearly limits any transfer of title for the marital

---

**20.** We note that F.L. § 8–205 is titled "Marital property—Award." However, we do not rely solely on the title. We recognize that, "[i]n determining the meaning of a statute, we look to the words of the statute itself, not a caption." *State v. Holton,* 193 Md.App. 322, 365, 997 A.2d 828 (2010). As this Court said in *Holton, id.:* "Captions and headings are mere catchwords and can never be taken to limit or expand the plain meaning of the statutory language."

home to those instances that are for the purpose of adjusting the equities *as to marital property.*

If " 'reasonably possible' " we read a statute " 'so that no word, phrase, clause or sentence is rendered surplusage or meaningless,' " *Parker v. State,* 193 Md.App. 469, 499, 997 A.2d 912 (2010) (quoting *Del Marr v. Montgomery County,* 169 Md.App. 187, 207, 900 A.2d 243 (2006), *aff'd,* 397 Md. 308, 916 A.2d 1002 (2007)), or "superfluous or redundant." *Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426 (2002); *see Collins v. State,* 383 Md. 684, 691, 861 A.2d 727 (2004); *Mayor of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 551, 814 A.2d 469 (2002). The clause highlighted above is central to the interpretation of the provision; it cannot be ignored.

We conclude that, under F.L. § 8–205(a)(2)(iii), a trial court may not order the transfer of title as to the marital home, owned TBE, when, as here, the home is deemed non-marital property by agreement. Therefore, we must vacate the order for transfer of title and remand for further proceedings.

In light of our disposition, we shall also vacate the entire monetary award, without addressing appellant's challenges as to the propriety of the size of the award. This is because, on remand, the court must consider the entirety of the parties' economic circumstances, which includes the Notley Road home, the parties' most valuable asset, which they continue to own jointly.

We are mindful that, even if the parties' Rule 9–207 Statement excluded certain assets as marital property, this "does not mean that the court may not consider such non-marital property as a factor in its equitable distribution of the remaining marital property." *Flanagan,* 181 Md.App. at 532, 956 A.2d 829. F.L. § 8–205(b) instructs the trial court to "determine the amount and the method of payment of a monetary award, *or the terms of the transfer of the interest in property described in subsection (a)(2) of this section,* or both, after *considering* . . . (2) the value of *all property interests* of each party." (Emphasis added.) We explained in *Flanagan, id.* at 532, 534–35, 956 A.2d 829:

As we discuss *infra,* however, the fact that property may be excluded from the marital property "pool," by agreement of the parties in a Rule 9–207 joint statement, does not mean that the court may not consider such non-marital property as a factor in its equitable distribution of the remaining marital property.

✻ ✻ ✻

With respect to the *amount* of a monetary award, that provision instructs the court to consider "the value of *all property interests of each party* " (emphasis added), which includes non-marital property. Unlike F.L. § 8–204(a), which governs what property is subject to distribution by the court, F.L. § 8–205(b)(2) requires that, in evaluating the equities between the parties, the court must consider all of the property of each party, both marital and non-marital. That would necessarily include marital property that becomes non-marital by virtue of the parties' agreement in a Rule 9–207 statement.

## II.

For the benefit of the court and the parties on remand, we shall address appellant's claim that the court was clearly erroneous in valuing Stone Development at $259,621. We conclude that the trial court's valuation was not clearly erroneous and explain.

According to appellant, there was insufficient evidence and "scant information" in the record to assign any value to that entity. Noting that appellee had the burden of producing evidence as to the value of Stone Development, he argues that appellee failed to produce credible evidence as to its value. Appellant asserts: "The sole 'evidence' of value in the record appears to be Husband's vague and inconsistent answer to an interrogatory regarding the value of marital property."

Further, appellant maintains that his interrogatory answer "did not rise to the level of an admission by a party opponent." Rather, he claims that he was "merely reporting what the Wall Street Journal's web site reflected as the value of one

property held by the LLC, not the LLC itself, and without any cognizance of the LLC's liabilities, or of any premium or discount added or subtracted because the parties own the LLC and not the property directly." Referring to his statement in his interrogatory answer about pending litigation concerning Stone Development, appellant asserts: "There is no information of what the litigation was about, or how great or small the LLC's liabilities may be, or, for that matter, whether the LLC generates income or losses."

Appellee counters that the court's "determination of the value of Stone Development was supported by the evidence presented and was not clearly erroneous." In particular, she contends that appellant's answer to Interrogatory No. 9 "was both an admission by a party and an owner's assertion of property value." In addition, she relies on her own testimony as to value. Appellee asserts:

Appellant had the opportunity to present evidence to contradict Appellee's testimony and to establish what he contended to be the correct current value of Stone Development based on the evidence presented, Appellee's testimony and Appellant's answer to Interrogatory No. 9. Based on that evidence, the Court found that Stone Development had a fair market value of $259,621.00 less marital debt of $25,000.00 to account for the home equity loan, resulting in a total value of $234,621.00.

In his reply brief, appellant explains: "Stone Development shared title on each property, in an unknown percentage, with a partner named Samuel Standard, and was then in the midst of sorting out both property ownership percentage and fraud claims with Mr. Standard." He asserts: "Despite knowing that Appellant and Appellee co-owned Stone Development, a value for the LLC could not be ascertained without knowing what percentage of the underlying properties Stone held, after properly valuing the properties themselves." In addition, appellant complains that the trial court "simply extrapolated a fair market value of Stone Development LLC, without having any idea of what portion of the assets in question Stone

Development LLC actually owned (as opposed to Mr. Standard)."

The parties' 9–207 Statement reflected that appellee and appellant agreed that Stone Development LLC was a marital asset.[21] The value of each item of marital property is a question of fact. *Flanagan*, 181 Md.App. at 521, 956 A.2d 829. We review the court's factual findings under the clearly erroneous standard. *Id.*

Pursuant to Maryland Rule 2–421(d), "answers to interrogatories may be used for any purpose to the extent permitted by the Rules of Evidence." *Crane v. Dunn*, 382 Md. 83, 96, 854 A.2d 1180 (2004). Under Maryland Rule 5–803(a)(1), appellant's interrogatory answer was an admission of a party opponent and, having been admitted into evidence, it constituted substantive evidence that the court could consider. *See Aetna Casualty & Surety Co. v. Kuhl*, 296 Md. 446, 455, 463 A.2d 822 (1983) ("Admissions are 'the words or acts of a party-opponent, or of his predecessor or representative, offered as evidence against him.' " (Citations omitted)).

 Moreover, appellee testified as to the value of Stone Development. "The owner of property is presumed to be familiar with its value so that his opinion of its value is admissible as evidence." *Hale v. Hale*, 74 Md.App. 555, 567, 539 A.2d 247, *cert. denied*, 313 Md. 30, 542 A.2d 857 (1988); *see also Stickell v. Mayor of Balt.*, 252 Md. 464, 473 n. 1, 250 A.2d 541 (1969) (recognizing that an owner of property "is prima facie competent to express his opinion as to its value without qualification as an expert"); *Colonial Pipeline Co. v. Gimbel*, 54 Md.App. 32, 44, 456 A.2d 946 (1983) ("The rule is stated to be that an owner of property is presumed to be qualified to testify as to his opinion of the value of property he owns; not because he has title, but on the basis that ordinarily the property owner knows his property intimately and is familiar with its value." citation omitted).

---

21. Appellant claimed it was titled to him, and the wife claimed it was jointly titled. The court found that it was jointly owned.

Of course, "The rule is not without limitations. If it is demonstrated that the owner possesses no knowledge of the market price and condition of the property in question, that testimony on value may be inadmissible." JOHN F. FADER, II. & RICHARD J. GILBERT, MARYLAND FAMILY LAW § 15–11(e), at 15–56 (4th ed.2006) (citing *Bastian v. Laffin*, 54 Md.App. 703, 713–14, 460 A.2d 623 (1983)). That was not the situation here.

Appellee testified that she believed that the value of Stone Development was "[a]bout the same" as the value assigned by appellant. She based her opinion on "assessments" that she received. She explained that "the initial money for the land in Michigan came from the $50,000 that [appellant] took from the Vanguard account," that the $25,610 for the down payments for the house and lot in Indianapolis came from her salary, and that she gave appellant "an additional $25,000 for renovations." Thus, the evidence showed that appellee, a co-owner, was familiar with Stone Development and was in a position to render an opinion as to value. " 'The trier of fact may believe or disbelieve, accredit or disregard, any evidence introduced.' " *Flanagan*, 181 Md.App. at 535, 956 A.2d 829 (citations omitted). The burden shifted to appellant to contradict the value.

Appellant stated in his answer to Interrogatory No. 9 that he and appellee own "Stone Development, LLC, 2112 North Park Ave. Indianapolis, Indiana, which owns a house and contiguous lot. The fair market value estimated from [the] Wall Street Journal web site [is] $259,621." Appellant also stated in his interrogatory answer that the "LLC owns 5 vacant pieces of Michigan properties for development with another party." However, appellant did not assign a value to these properties, claiming that he did "not know the fair market value of these properties. Parcel lots of vacant land are difficult to value."

Accordingly, appellant's valuation of $259,621 applied solely to the Indianapolis properties. In other words, appellant gave a value as to just one of several lots owned by Stone Development. As the trial court recognized in its colloquy with counsel, the various vacant lots surely had at least some value.

Therefore, the total of the properties held by Stone Development would have exceeded the value of just the one lot in Indiana, for which appellant provided a value in his answer to Interrogatory 9.

Furthermore, the court did not have to credit appellant's speculative and unsubstantiated assertion in his interrogatory answer that pending litigation adversely affected the value of the properties. *See Solomon v. Solomon*, 383 Md. 176, 191, 857 A.2d 1109 (2004) (finding that "claimed tax liabilities associated with an uncompelled, premature liquidation of a retirement account" were not "immediate and specific" and were too "speculative" to be considered "for purposes of distributing a marital property award"). Indeed, appellant indicated he was attempting to obtain sole ownership of the properties held by Stone Development. If successful, this could result in an increase in value.

### III.

Appellant argues that "the divorce court abused its discretion by awarding attorneys' fees to be paid by a jobless, virtually penniless husband, to a cardiologist wife the divorce court found possessed non-marital property in excess of $1,000,000." In appellant's view, "his inability to testify and/or present evidence concerning the circumstances which led to his inability to fully comply with discovery during the pre-trial stage of the proceeding, as well as to his present financial circumstances, precluded a fair and equitable decision regarding the attorneys' fees assessed, and the same should be vacated."

Appellee counters that, "[i]n making its award of attorney's fees the Court found, and the record clearly shows, that Appellant 'offered essentially no defense to [appellee's] request for a divorce or the issues regarding marital property' and that Appellant's conduct in discovery, by failing to appear for deposition and produce documents was not substantially justified, was willful, in bad faith and 'deliberately obstructive.'" Further, appellee asserts that she "clearly met her

burden in presenting evidence regarding the reasonableness of the attorney's fees bills." As the award of attorney's fees of $12,500 "was clearly supported by the evidence presented," appellee insists that the court did not abuse its discretion.

Because we have vacated the monetary award, the award of attorney's fees must necessarily be vacated and reconsidered on remand as well. This is because "[t]he factors underlying alimony, a monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other." *Turner v. Turner*, 147 Md.App. 350, 400, 809 A.2d 18 (2002); *see also Flanagan*, 181 Md.App. at 544, 956 A.2d 829; *Doser v. Doser*, 106 Md.App. 329, 335 n. 1, 664 A.2d 453 (1995); *see, e.g., Simonds v. Simonds*, 165 Md.App. 591, 608, 886 A.2d 158 (2005). Nevertheless, we shall briefly discuss this issue for the benefit of the chancellor and the parties on remand.

Attorney's fees in divorce proceedings are allowable by statute. F.L. § 8–214 provides for an award of "reasonable and necessary expenses," including counsel fees and costs, in proceedings for disposition of marital property.[22] An

---

22. F.L. § 8–214, titled **"Award of reasonable and necessary expenses,"** states:

(a) *Definition.*—In this section, "reasonable and necessary expense" includes:
(1) suit money;
(2) counsel fees; and
(3) costs.
(b) *Award authorized.*—At any point in a proceeding under this subtitle, the court may order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding.
(c) *Considerations by court.*—Before ordering the payment, the court shall consider:
(1) the financial resources and financial needs of both parties; and
(2) whether there was substantial justification for prosecuting or defending the proceeding.
(d) *Lack of substantial justification and good cause.*—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall

appellate court will not disturb a trial court's award of attorney's fees absent an abuse of discretion. *Richards v. Richards,* 166 Md.App. 263, 285, 888 A.2d 364 (2005); *Collins v. Collins,* 144 Md.App. 395, 447, 798 A.2d 1155 (2002).

Before trial, Judge Harrington had ruled that appellee was entitled to attorney's fees in connection with appellant's improper conduct during discovery. The amount was to be determined at trial. In awarding attorney's fees, the trial court found that appellant "offered essentially no defense to [Appellee's] request for a divorce or the issues regarding marital property" and that his failure to cooperate in the discovery process was "willful and in bad faith." The record fully supports the findings of both judges.

█ In Maryland, "[a] party seeking reimbursement of fees bears the burden to present evidence concerning their reasonableness." *Sczudlo v. Berry,* 129 Md.App. 529, 550, 743 A.2d 268 (1999) (citations omitted). Appellee's attorney's fees amounted to $26,442.97 through May 6, 2008. Appellee was also billed for eight and a half hours of attorneys' fees incurred during the trial in May 2008, totaling $3,325.

At trial, appellant's counsel waived the presence of his client. Nevertheless, the court gave appellant's attorney opportunities to try to secure appellant's presence. Appellant's counsel never asked the court for a continuance, nor did he proffer any evidence. And, through counsel, appellant was afforded the opportunity to cross-examine appellee and to present contradictory evidence with respect to the reasonableness of appellant's attorney's fees bills.

The trial court carefully examined the legal bills. It determined that the attorney's fees were fair and reasonable. *See Sczudlo,* 129 Md.App. at 551 n. 3, 743 A.2d 268 ("Of course, the court, as an experienced trial judge and former lawyer of longstanding, is qualified to opine as to reasonableness of attorney's fees based on its familiarity with the time and effort

award to the other party the reasonable and necessary expense of prosecuting or defending the proceeding.

of counsel as evidenced by the presentations in the proceedings before the court."); *Kline v. Chase Manhattan Bank*, 43 Md.App. 133, 145–46, 403 A.2d 395 (1979) (same).

**JUDGMENT AFFIRMED AS TO GRANT OF ABSOLUTE DIVORCE, BUT VACATED IN ALL OTHER RESPECTS. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT, 50% BY APPELLEE.**